(text box: 1)
 NO. 5-99-0166

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

____________________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Williamson County.

)

) No. 98-CF-370

)

GARY DEAN LEE, ) Honorable

) Donald Lowery,

Defendant-Appellant. ) Judge, presiding.

__________________________________________________________________________________________

 

JUSTICE KUEHN delivered the opinion of the court:

Ellen Drake was a petite woman who lived in a small home located on Pleasant Hill Road in Carbondale, Illinois.  She and her pet German shepherd shared a pleasant existence together.  However, there was nothing pleasant in how that life came to an end.  On January 16, 1998, Ellen Drake perished in her home, succumbing to nine massive stab wounds sustained by her diminutive chest.  In all, she suffered 14 wounds.  A lacerated lung and heart bled until her chest cavity filled.  Without the blood flow needed to sustain life, Ellen died.   

It appeared that Ellen could offer little if any resistance to her savage assailant, an attacker who had no stomach for a match with the home's other inhabitant.  Ellen's dog was found locked inside the bathroom.   

On January 18, 1998, the defendant, Gary Dean Lee, was arrested in Memphis, Tennessee, driving Ellen's brand-new car.  A bloody-bladed butcher knife was found inside the car just to the left of where the defendant was sitting.  The defendant had blood on his clothing.  The blood found on the knife and on the clothing proved to be consistent with the type of blood that Ellen had lost.  

The defendant volunteered a statement, which was taped.  He readily admitted that he broke into Ellen's home, ravaged her belongings, and took what he pleased.  However, Ellen's death mystified him.  He denied any role in producing it.  His denial could not account for how Ellen's blood came to rest upon his clothing.  

The defendant left his fingerprints in places consistent with his admissions.  They were found near Ellen's emptied purse and on the cabinet that once housed her stereo equipment.  The fingerprints were also found in close proximity to blood splatter found in certain areas of the home.  

The defendant had pilfered numerous items, including a microwave oven, two television sets, a computer, a stereo, a boom box, a CD player, and a cellular phone.  There were several witnesses who saw him with these items on the night of the murder.  In fact, the defendant spent most of that evening trying to find buyers for sundry things that once entertained and enhanced life's enjoyment on Pleasant Hill Road.  It was obvious from his activity that he made several trips back to the residence to obtain further loot.

The main buyer of these items was a cocaine merchant.  At the trial, he revealed the reason behind the defendant's enterprising endeavors that night.  The defendant was binging on cocaine.  For the most part, Ellen's property was bartered, piece by piece, for pieces of crack cocaine.  Her life's possessions maintained the defendant's drug-induced euphoria into the late evening hours.  The fruit of the defendant's felonious undertaking went up in smoke before the night's end.    

The defendant stood trial for capital murder, residential burglary, robbery, and theft over $10,000.  The jury found him guilty.  After a death penalty sentencing hearing, the jury spared the defendant's life.  The determination of the appropriate punishment passed to the trial judge.  

The trial judge determined that the killing of Ellen Drake was particularly brutal and heinous indicative of wanton cruelty.  Based upon this finding, he sentenced the defendant to a life of imprisonment.  In addition, he sentenced the defendant to seven-year prison terms for robbery and theft but allowed him to serve those sentences at the same time that he fulfilled his life sentence.  The trial judge also determined that after the defendant served his life sentence, he would need to serve an additional 15 years of imprisonment for the residential burglary.  By imposing a 15-year consecutive prison sentence for the residential burglary, the trial judge assured that the defendant could neither satisfy the punishment imposed nor expiate his misdeeds, at least not in this lifetime.  

  On appeal, the defendant complains that several errors occurred during the proceedings to verdict, depriving him of a fair trial.  He also challenges the constitutional validity of his sentences.  

I.  TRIAL ERROR

A.  
Batson
 Challenge

The defendant is an African-American.  Of the 71 prospective jurors drawn to determine the defendant's fate, only one shared this status.  The State exercised a peremptory challenge to remove that single African-American juror from the jury panel.  The defendant objected and asserted that her removal was racially motivated.  Before the trial judge could find the presence or absence of a 
prima facie
 case of discriminatory intent, the prosecutor disavowed racial motivation and tendered several race-neutral reasons that shaped his decision to exercise one of his peremptory challenges.  The trial judge ruled that the challenge would stand and excused the prospective juror.  He found that the challenge had not been used to systematically exclude a given race from the jury.  The trial judge added that if he had "any inclination" that the prospective juror was being excluded because of race, he would not have removed her from the panel.  

On appeal, the defendant maintains that the exclusion of the sole African-American jury panel member deprived him of equal protection under the law as guaranteed by the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2).

It is well-settled that the State may not use its peremptory challenges to purposefully exclude members of a jury venire based upon their race.  
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).  

This constitutional rule operates through a four-step process employed when any party raises the claim that peremptory challenges are being exercised in a discriminatory manner.  First, the party making the claim must establish a 
prima facie
 case of purposeful discrimination.  If a 
prima facie
 case is made, the burden then shifts to the other party to articulate a race-neutral reason for striking the prospective jurors in question.  The trial court must then determine whether the party making the claim has met the burden of establishing purposeful discrimination.  
Batson
, 476 U.S. at 93-94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721.  Even if the party establishes purposeful discrimination, even in cases where the State concedes a discriminatory motive, the claim fails if the State can prove that the prospective juror would have been struck anyway for other reasons.  See 
People v. Hudson
, 195 Ill. 2d 117, 745 N.E.2d 1246 (2001).

This fourth step warrants further comment, having been very recently adopted by our supreme court in a case that addressed a gender-based peremptory challenge.  In 
People v. Hudson
, one of the prosecutor's race-neutral reasons for exercising a challenge was the prospective juror's gender.  
Hudson
, 195 Ill. 2d at 129, 745 N.E.2d at 1253-54.  Gender is a prohibited discriminatory basis for the use of peremptory challenges.  
J.E.B. v. Alabama ex rel. T.B.
, 511 U.S. 127, 145, 128 L. Ed. 2d 89, 107, 114 S. Ct. 1419, 1430 (1994). 

Confronted with the prosecutor's admission that one of the reasons for the exercise of a peremptory challenge was to keep women off of the jury, the majority of our supreme court adopted another step in the process of determining whether prohibited motivations for the exercise of peremptory challenges warrant relief.  
Hudson
, 195 Ill. 2d at 136-38, 745 N.E.2d at 1258.  Coined "dual motivation analysis," this added step allows the State to possess a discriminatory purpose as one of its reasons for the exercise of a challenge, provided that it can establish that it would have struck the prospective juror anyway, for other, nondiscriminatory reasons.  
Hudson
, 195 Ill. 2d at 133, 745 N.E.2d at 1256 (quoting 
United States v. Tokars
, 95 F.3d 1520, 1533 (11th Cir. 1996)).  Thus, even if we find that the State exercised this peremptory challenge based upon the color of the prospective juror's skin, the matter must be remanded for a hearing to determine whether there were dual motivations.  If there were other, legitimate reasons that would have resulted in the prospective juror's removal from the panel, it does not matter that a part of the prosecutor's thinking was clearly attributable to race.  

Explanations advanced by the party against whom a 
Batson
 claim has been made must be clear and reasonably specific, but they need not rise to the level of a challenge for cause.  
Batson
, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.  However, mere assertions of a nondiscriminatory motive for exercising a peremptory challenge are insufficient to rebut a 
prima facie
 case.  
Batson
, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24.

Where a trial judge rules on the ultimate question of purposeful discrimination, the preliminary issue of whether a 
prima facie
 showing has been made becomes moot.  
Hernandez v. New York
, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866 (1991); 
People v. Hudson
, 157 Ill. 2d 401, 426-27, 626 N.E.2d 161, 171 (1993).  In such instances, a reviewing court need only consider whether the trial judge's ruling as to the validity of the proffered reasons for challenging the particular prospective jurors was in error.  
Hudson
, 157 Ill. 2d at 426-27, 626 N.E.2d at 171.  Because a trial judge's finding on the ultimate issue of discrimination rests largely on credibility determinations, it is entitled to great deference on review and will not be set aside unless clearly erroneous.
  Hudson
, 157 Ill. 2d at 426-27, 626 N.E.2d at 171.

Here, the prosecutor volunteered a race-neutral explanation for the challenge's use without any finding that the defendant made a 
prima facie
 case.  Because of the prosecutor's preemptive explanation, we must decide whether the trial judge's acceptance of the race-neutral reasons tendered in support of the challenge was clearly erroneous as against the manifest weight of the evidence.  See 
People v. Mitchell
, 152 Ill. 2d 274, 289-90, 604 N.E.2d 877, 886 (1992). 

The prosecutor in this case offered three reasons for his exercise of the peremptory challenge against the prospective juror.  First, he felt that she appeared confused by the trial judge's 
voir dire
 questions.  She indicated "yes" when asked whether she would automatically vote to impose a death sentence should she determine that the defendant was guilty as charged.  Second, the prosecutor noted that she misunderstood the presumption-of-innocence question on the juror questionnaire.  Third, her simple "yes" and "no" answers to most of the 
voir dire
 questions that were posed raised a concern in the prosecutor's mind that she might have a tendency to be easily led in her thinking, surrendering her independent judgment to the sway of someone else.  

The United States Supreme Court has held that unless a discriminatory intent is inherent in the State's explanation for the use of a peremptory challenge, the reason offered will be deemed race-neutral.  
Hernandez
, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866.  Our supreme court, analyzing a 
Batson
 claim raised in a civil case, set forth this proposition with approval.  
McDonnell v. McPartlin
, 192 Ill. 2d 505, 526, 736 N.E.2d 1074, 1087 (2000).  However, the question of whether this method of assessing discriminatory purpose provides equal protection as envisioned under the Illinois Constitution was not raised or decided.  

Batson v. Kentucky
 makes no mention of the fact that a prosecutor's explanation itself must provide additional, direct evidence of discriminatory motive.  It is difficult to imagine how a defendant who establishes a 
prima facie
 case of discriminatory purpose would ever generate evidence of a prosecutor's actual subjective intent to discriminate.  If a prosecutor's tendered reasons for the exercise of a peremptory challenge must be taken at face value, any perfunctory reason other than race would seem to do.  As Justice Stevens noted in 
Hernandez v. New York
, the methodology set forth in 
Batson
 
v. Kentucky
 did not contemplate additional evidence of discriminatory intent unless the explanation provided by the prosecutor was sufficiently powerful to rebut the 
prima facie
 showing of discriminatory purpose; it contemplated that the court would make a decision after weighing the verity of the tendered explanation against that evidence from which a discriminatory intent had already been reasonably inferred.  
Hernandez
, 500 U.S. at 375-76, 114 L. Ed. 2d at 416-17, 111 S. Ct. at 1875 (Stevens, J., dissenting, joined by Marshall, J.).

 Whether the prosecutor's reasons are simply taken at face value and deemed race-neutral in the absence of inherent discriminatory intent or whether those reasons are weighed against the peremptory challenge of a lone African-American prospective juror, the trial judge's decision to allow the challenge cannot be said to constitute clear error. 

The defendant maintains that the trial judge's acceptance of the prosecutor's race-neutral reasons was clearly erroneous.  He points out that numerous other prospective jurors who fit the prosecutor's criteria for concern were not removed from the panel.  An acceptance of Caucasian jurors who demonstrated confusion during questioning, misunderstood the juror questionnaire, and gave curt answers to questions posed supports a conclusion that the prosecutor's claim was a pretext for exclusion based upon race. 

Notwithstanding, it cannot be said that the trial judge's acceptance of the reasons stated for the removal of the particular juror in question, and his determination that the prosecutor did not discriminate on the basis of race, was clearly wrong.  Here, there existed two permissible views of the evidence.  On the one hand, the State exercised a peremptory challenge against the only African-American juror in the venire.  Standing alone, that circumstance might lead a trial judge to reasonably infer a discriminatory intent.  However, the removal of only one prospective juror who shared the defendant's ethnicity, albeit the only African-American in the venire, diminishes the inference to be drawn.  In most cases where discriminatory intent is inferred, the defendant can demonstrate a noticeable pattern of juror removal that coincides with several prospective jurors' race.  

On the other hand, the record supports the prosecutor's tendered reasons for his decision to challenge the prospective juror.  She demonstrated some difficulty providing appropriate answers to simple questions designed to determine her understanding of the basic concepts that would guide her decision.  The defendant argues that the prosecutor's concern was disingenuous because he should have wanted a juror who did not believe in the presumption of innocence and who expressed a desire to impose death automatically upon a finding of guilt.  However, prosecutors who possess a proper understanding of their oath of office and public charge would not condone the sitting of such a juror.  In addition, the prospective juror's handling of 
voir dire
 questions could support a conclusion that she would easily couple herself to someone else and not exercise her independent judgment in assessing the evidence.  We do not have the benefit of observing the various prospective jurors' demeanor in providing answers, a disadvantage that inures to the trial judge's favor when we review his acceptance of this reason as a legitimate race-neutral basis for the challenge.  Where, as here, " 'there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' "  
Hernandez
, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1872 (quoting 
Anderson v. City of Bessemer City, North Carolina
, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528, 105 S. Ct. 1504, 1511 (1985)).

We conclude that the defendant was not deprived of his constitutional right to the equal protection of law by the exclusion of the sole African-American venireperson from his jury panel. 

B.  Introduction of Prior Fingerprint Card

Next, the defendant claims that the State's method of establishing that the defendant left his fingerprints at the crime scene deprived him of a fair trial.  In laying the foundation for the fingerprint evidence, the State introduced a two-year-old fingerprint card as evidence of the defendant's known prints.  The card, bearing the defendant's inked prints, was created before his arrest for this offense, at a time when the defendant was being booked on an unrelated charge.  The deputy sheriff who authenticated the card told the jury that he created the exhibit at the Jackson County jail more than two years prior to the defendant's arrest in this case.  

Proof that a defendant has been arrested on some prior occasion unrelated to the case at hand is clearly improper.  
People v. Hawkins
, 4 Ill. App. 3d 471, 473, 281 N.E.2d 72, 74 (1972).  Hence, the defendant argues that the use of the fingerprint card alerted the jury to the fact that the defendant had suffered a previous arrest and tainted his trial.  We disagree.

While it would have been preferable to create a new card containing the known inked prints of the defendant, the use of the old card did not cause undue prejudice.  The State made no mention of the fact that the defendant was under arrest when the inked prints were obtained.  Furthermore, the fingerprint card was never published to the jury.  While we acknowledge that the jury may have speculated upon a prior arrest that led to fingerprint processing, there are many potential explanations for a government agency having a person's fingerprints on file, only one of which might be a prior arrest.  
People v. Hopkins
, 229 Ill. App. 3d 665, 675, 593 N.E.2d 1028, 1034 (1992).  Furthermore, where an inked fingerprint card is admitted to establish an offender's identity, a proper element of the State's case, and where the inked prints were the only such prints available at the time that comparisons were made, it is not necessarily error to admit them into evidence.  
People v. Ray
, 130 Ill. App. 3d 362, 366, 471 N.E.2d 933, 936-37 (1984).

We find that the State was entitled to introduce the inked fingerprint card, that the method employed appropriately diminished any chance that the jury would consider the card as evidence of criminal propensity, and that the defendant was not unduly prejudiced by its admission.

C.  Being Shackled at the Jury's Return of Verdicts

Next, the defendant claims that the State forced him to stand shackled before the jury, an event that deprived him of a fair trial.

It is undisputed that the defendant was bound hand and foot when the jury returned to the courtroom with its verdicts.  The defendant behaved during the trial.  There was no finding that his restraint was necessary to maintain order in the courtroom.  Apparently, jail personnel, unbeknownst to the trial judge, decided not to remove the defendant's shackles for the reading of the verdicts.  The defendant's restrained condition went unnoticed by one of his own lawyers, as well as the trial judge, until after the verdicts were returned.  

A defendant cannot be subjected to physical restraint while in the courtroom unless the trial judge finds that such restraint is necessary.  Absent reason to believe that the defendant may try to escape, may pose a threat to the safety of people in the courtroom, or may disrupt orderly proceedings, the defendant must not be shackled.  
People v. Boose
, 66 Ill. 2d 261, 266, 362 N.E.2d 303, 305 (1977).  The question of whether the defendant was denied a fair trial by unwarranted restraint during proceedings is one of law that we review 
de novo
.  
People v. Krueger
, 175 Ill. 2d 60, 64, 675 N.E.2d 604, 607 (1996).

There are three kinds of cases where the question of an accused's restraint can arise: (1) cases that involve defendants who stand trial in shackles, (2) cases where excessive security measures are evident during trial, and (3) cases where a defendant's jury gets a glimpse of the defendant while in shackles.  
People v. Walsh
, 80 Ill. App. 3d 754, 768, 400 N.E.2d 587, 597-98 (1980).  Where, as here, the exposure of a defendant's restraint to the eyes of a juror is brief, reversible error will not be found absent an affirmative showing of prejudice.  
Walsh
, 80 Ill. App. 3d at 768-69, 400 N.E.2d at 597-98.

Initially, we note that the defendant's restraints were apparently rather obscure.  Even one of the defendant's own attorneys did not notice them.  The trial judge was unaware of their presence until the matter was brought to his attention the following day.  At that time, he noted for the record that it was unlikely that any of the jurors noticed the shackles because none of them looked at the defendant when the verdict was returned and read.  We do not know if any jurors noticed that the defendant was shackled when the verdicts were returned.  No inquiry was made of the jury panel.

If any of the jurors saw the defendant in restraints, it was at a time when they had already signed and delivered their decision to the court.  Their decision as to the defendant's guilt was not subject to change or influence as a result of the incident.  Any prejudice to a defendant from his appearance in handcuffs at the reading of the verdict is purely speculative.  
People v. Bowel
, 129 Ill. App. 3d 940, 946, 473 N.E.2d 962, 966 (1985), 
rev'd on other grounds
, 111 Ill. 2d 58, 488 N.E.2d 495 (1986).  While jurors who saw the defendant restrained may have been influenced thereafter by this observation, the subsequent jury determination proved favorable to the defendant.  The State was unable to obtain capital punishment.

Under the circumstances presented, we do not believe that the defendant was prejudiced by his restraint inadvertently in the presence of the jury. 

[The following text is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).]

D.  One Act, One Crime

Next, the defendant asks us to vacate his theft conviction because it is based upon the same act as the robbery conviction.  The defendant evokes the one act/one crime rule set forth by our supreme court in 
People v. King
, 66 Ill. 2d 551, 363 N.E.2d 838 (1977).

The one act/one crime rule prohibits multiple convictions from being carved from a single act.  
King
, 66 Ill. 2d at 566, 363 N.E.2d at 844.  However, multiple convictions and sentences are permitted where the defendant has committed several acts, despite a close interrelationship between those acts.  
People v. McLaurin
, 184 Ill. 2d 58, 105, 703 N.E.2d 11, 33 (1998).  The definition of "act" under 
People v. King
 is " 'any overt or outward manifestation which will support a different offense.' "  
People v. Rodriguez
, 169 Ill. 2d 183, 188, 661 N.E.2d 305, 307 (1996) (quoting 
King
, 66 Ill. 2d at 566, 363 N.E.2d at 844).  Thus, under 
People v. King
, we must first determine whether the conduct consists of separate acts or a single physical act.  
Rodriguez
, 169 Ill. 2d at 186, 661 N.E.2d at 306.  If we determine that the defendant committed multiple acts, we must further determine whether any of those acts constituted lesser-included offenses.  
Rodriguez
, 169 Ill. 2d at 186, 661 N.E.2d at 306.  If so, multiple convictions would be improper.

We decide the question 
de novo
.  
People v. Milton
, 309 Ill. App. 3d 863, 868, 723 N.E.2d 798, 802 (1999).

We believe that the convictions for robbery and for theft over $10,000 should both stand.  The evidence clearly established that the defendant did not commit one act of taking property.  It was obvious that the defendant made multiple trips back to the victim's home throughout the evening of the murder, taking more property, in order to buy a further supply of cocaine.  According to the evidence at the trial, the defendant started smoking crack about two or three o'clock in the afternoon with a friend named Raymond Nesby.  The defendant left Nesby when the defendant's money ran out.  Nesby saw the defendant again at about eight or nine o'clock that evening, at which time the defendant was driving Ellen's car and was trying to sell a television set and a boom box.  When the defendant sold those items, he bought and smoked more crack.  The defendant left again and returned with another television set that he sold for more crack.  When the drug was again depleted, the defendant left again and returned 45 minutes later with a microwave oven, which provided a further drug supply.  When this supply was consumed, the defendant disappeared for another 45 minutes and returned with stereo equipment.

The evidence clearly demonstrates that the defendant committed several acts of taking, over an extended period of time.  Thus, we need to decide whether the theft charge constituted a lesser-included offense of the robbery charge.

The question of whether one offense is a lesser-included offense of another is answered by examining the charging instrument.  
People v. Novak
, 163 Ill. 2d 93, 112-13, 643 N.E.2d 762, 772 (1994).  The robbery charge alleged that the defendant knowingly took the following property from Ellen by the use of force or by threatening the imminent use of force:  two color television sets, a microwave, United States currency, and jewelry.  The theft charge alleged that the defendant knowingly exerted unauthorized control over the following property belonging to Ellen and intended to permanently deprive her of its use:  a 1998 Toyota Camry, two television sets, a stereo system, a microwave oven, and United States currency.  The car and stereo were not alleged as property taken by force.  Thus, the theft charge would not constitute a lesser-included offense of the charged robbery.

For the reasons stated, we affirm the defendant's convictions.

[The preceding text is nonpublishable under Supreme Court Rule 23.]

II.  CONSTITUTIONALITY OF SENTENCES

The defendant challenges the validity of his life sentence for first-degree murder and the validity of his consecutive 15-year prison sentence for residential burglary.  We are asked to examine the sentencing schemes under which these two sentences were imposed, in light of 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), a case in which the United States Supreme Court held a New Jersey hate-crime statute unconstitutional because it commissioned judges to make a factual finding that enhanced their power to punish beyond the maximum penalties prescribed for any given criminal offense.   

In 1994, Charles Apprendi, Jr., took a handgun and fired a spray of bullets into the home of a new neighbor who did not fit Apprendi's color criteria for living in a Vineland, New Jersey, neighborhood.  
The State leveled numerous criminal charges, but none of them alleged that his actions were racially motivated.  
Apprendi
, 530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351.  Apprendi pleaded guilty to possession of a firearm for an unlawful purpose, an offense for which the New Jersey legislature provided a 10-year maximum sentence.  
Apprendi
, 530 U.S. at 469-70, 147 L. Ed. 2d at 442-43, 120 S. Ct. at 2352.  However, an entirely separate statutory provision authorized the imposition of an additional 10 years of imprisonment if the sentencing judge determined that Apprendi committed the crime because of racial hatred.  The sentencing judge found that Apprendi was racially motivated and, because of that fact, sentenced Apprendi to a prison sentence greater than the 10-year maximum that could otherwise have been imposed.  
Apprendi
, 530 U.S. at 470, 147 L. Ed. 2d at 443, 120 S. Ct. at 2352.

The Supreme Court, relying upon the constitutional guarantee of due process of law and the constitutional right to a jury trial, struck down the New Jersey hate-crime enhancement statute.  
Apprendi
, 530 U.S. at 470, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351.  The Court took an exhaustive look at what our Founding Fathers promised when they bestowed the right to a trial by jury in all criminal cases.  Inherent in that promise was the right to have a jury determine all facts necessary to a determination of the maximum punishment the law allows.  The Supreme Court handed down a constitutional-based rule, stating, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury[] and proved beyond a reasonable doubt."  
Apprendi
, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63.

We have already tested 
Apprendi
's constitutional reach in the context of the two statutory sentencing schemes at issue here.  In the case of section 5-8-4(b) of the Unified Code of Corrections (730 ILCS 5/5-8-4(b) (West 1996)) and the imposition of consecutive sentencing based upon a judicial finding of a societal need for protection, we could not arrive at a consensus.  See 
People v. Lucas
, 321 Ill. App. 3d 49, 746 N.E.2d 1211 (2001); 
People v. Hayes
, 319 Ill. App. 3d 810, 745 N.E.2d 31 (2001); 
People v. Maiden
, 318 Ill. App. 3d 545, 743 N.E.2d 1052 (2001); 
People v. Primm
, 319 Ill. App. 3d 411, 745 N.E.2d 13 (2000); 
People v. Sutherland
, 317 Ill. App. 3d 1117, 743 N.E.2d 1007 (2000); 
People v. Mason
, 318 Ill. App. 3d 314, 741 N.E.2d 1088 (2000), 
vacated
, No. 90854 (June 29, 2001) (supervisory order); 
People v. Harden
, 318 Ill. App. 3d 425, 741 N.E.2d 1063 (2000), 
vacated
, No. 90811 (June 29, 2001) (supervisory order); 
People v. Waldrup
, 317 Ill. App. 3d 288, 740 N.E.2d 71 (2000), 
vacated
, No. 90735 (June 29, 2001) (supervisory order); 
People v. Carney
, 317 Ill. App. 3d 806, 740 N.E.2d 435 (2000), 
rev'd
, No. 90549 (Ill. June 21, 2001); 
People v. Clifton
, 321 Ill. App. 3d 707, 750 N.E.2d 686 (2000).  The Illinois Supreme Court recently addressed our conflicting opinions and sided with those who determined that the constitutional rule enunciated in 
Apprendi v. New Jersey
 did not apply to the imposition of consecutive sentences.  
People v. Wagener
, 196 Ill. 2d 269, 752 N.E.2d 430 (2001).  

In 
People v. Wagener
, our high court found that 
Apprendi
 concerns are not implicated by consecutive sentencing.  It reasoned that consecutive sentences are not by their nature transmuted into a single sentence.  Because consecutive sentences remain discrete, the court held that a determination that sentences are to be served consecutively cannot run afoul of 
Apprendi
, which only addresses sentences for individual crimes.  
Wagener
, 196 Ill. 2d at 286, 752 N.E.2d at 442.  Since each of the sentences that Wagener received were within the statutory range established by the legislature, there was no constitutional violation.  

Thus, the defendant's constitutional challenge to his 15-year consecutive sentence for residential burglary, pursuant to section 5-8-4(b), is easily answered.  There was no constitutional violation in the statutory method by which it was imposed, and the sentence is valid.  See 
Wagener
, 196 Ill. 2d at 286, 752 N.E.2d at 442.

We turn to the constitutionality of the defendant's sentence to life imprisonment for the crime of first-degree murder.  We have already held that the imposition of life imprisonment based upon a judicial finding of fact–
i.e.
, that a murder is accompanied by brutal or heinous behavior indicative of wanton cruelty–is unconstitutional.  
People v. Nitz
, 319 Ill. App. 3d 949, 968, 747 N.E.2d 38, 54 (2001); 
People v. Joyner
, 317 Ill. App. 3d 93, 110, 739 N.E.2d 594, 606-07 (2000); 
People v. Beachem
, 317 Ill. App. 3d 693, 708, 740 N.E.2d 389, 398-99 (2000).

The State believes that 
People v. Wagener
 casts doubt upon the correctness of our earlier rulings.  It urges us to revisit 
People v. Nitz
, in light of certain observations made by our supreme court in deciding 
People v. Wagener
.  Specifically, Justice Freeman noted:  "Each of defendant's individual sentences was within the statutory range established by the legislature.  This is all that 
Apprendi
 requires."  
Wagener
, 196 Ill. 2d at 287-88, 752 N.E.2d at 443.

In 
People v. Nitz
, we departed from a view taken by our colleagues that 60 years was the prescribed statutory maximum sentence for the crime of first-degree murder.  See 
Beachem
, 317 Ill. App. 3d 693, 740 N.E.2d 389.  We agreed with the State that, in lieu of death, natural-life imprisonment is the prescribed statutory maximum sentence for first-degree murder.  
Nitz
, 319 Ill. App. 3d at 964, 747 N.E.2d at 50-51.  However, we disagreed with the argument the State advanced based upon that fact.  The State argued that a sentence within the prescribed statutory range of sentences was all that 
Apprendi
 required, even though the maximum sentence could not be imposed without an additional finding of fact determined by the sentencing judge rather than the jury.  
Nitz
, 319 Ill. App. 3d at 964, 747 N.E.2d at 50-51.

We noted:

"[T]he permanent loss of freedom is a potential penalty for committing first-degree murder.  However, its actual imposition as a punishment turns upon a fact that a state officer is empowered to decide, rather than a jury.  The promise of a trial at which facts are determined by fellow citizens rather than state officers or government officials cannot abide such a scheme.  Justice Scalia, in an answer to the 
Apprendi
 dissent, provides the simple reason when he explains what the right to trial by jury guarantees:

'What ultimately demolishes the case for the dissenters is that they are unable to say what the right to trial by jury 
does
 guarantee if, as they assert, it does not guarantee–what it has been assumed to guarantee throughout our history–
the right to have a jury determine those facts that determine the maximum sentence the law allows
.'  (Latter emphasis added.)  
Apprendi
, 530 U.S. at 498-99, 147 L. Ed. 2d at 460, 120 S. Ct. at 2367 (Scalia, J., specially concurring).  

We adhere to Justice Scalia's view of what the right to a trial by jury has historically guaranteed and, therefore, must continue to guarantee–the right to have a jury determine those facts that determine the maximum sentence that the law will allow.  After a jury determines the facts that fix the limit of exposure to punishment, judges are free to consider a wide range of factors to determine whether the maximum punishment should be imposed."  
Nitz
, 319 Ill. App. 3d at 968-69, 747 N.E.2d at 54.

In arriving at a result contrary to the State's position, we felt it important to examine a United States Supreme Court case that preceded 
Apprendi v. New Jersey
 and foreshadowed its outcome:  
Jones v. United States
, 526 U.S. 227, 231, 143 L. Ed. 2d 311, 318, 119 S. Ct. 1215, 1218 (1999).  
 

Nathaniel Jones was convicted of the federal crime of carjacking. 
 One of the victims of the carjacking sustained a perforated eardrum.  The sentencing judge determined that the injury constituted serious bodily injury resulting from the crime and, based upon that finding, sentenced Jones to 25 years of imprisonment.  The sentence was 10 years greater than the maximum sentence Congress provided for those facts determined by the jury.  
Jones
, 526 U.S. at 231, 143 L. Ed. 2d at 318-19, 119 S. Ct. at 1218.  

The Supreme Court confronted the validity of Jones's sentence.  

The statutory machinery at issue allowed Jones's jury to determine that he had committed the acts that constitute federal carjacking.  Thereafter, Congress invited the presiding judge, rather than Jones's jury, to find that either serious bodily injury or death occurred during the commission of those acts.  Congress wanted to afford greater maximum penalties in the event of serious bodily injury or death, and it expected a judge rather than a jury to determine the facts that released those higher penalties.  The federal carjacking statute's design thus resembles the method our legislators chose to increase penalties for crimes accompanied by brutal or heinous behavior indicative of wanton cruelty.

The federal statute's design allowed a jury to determine that the elements of carjacking, the crime charged, were proven beyond a reasonable doubt.  Once a federal jury determined that someone had committed the crime of carjacking, the statute sought to have a federal judge consider the crime's particular nature and determine whether either of two factors accompanied it.  Congress wanted to remove these two factors from the jury's assessment and entrust a determination of their existence to a federal judge.  If either factor was found to exist, Congress empowered the judge to impose greater punishment.  Congress put significantly increased maximum penalties in place in order to accommodate either additional finding of fact.

Thus, the congressional design was closely akin to the design employed by our legislature to raise punishment levels depending upon the existence of a fact assigned to a judge for determination.  The sentencing provision at issue here establishes a maximum penalty of 60 years if the jury determines that a defendant committed acts that constituted the crime of first-degree murder.  Once the jury determines that a defendant has committed first-degree murder, the statute authorizes the judge to consider the peculiar nature of the defendant's crime and determine whether exceptionally brutal or heinous behavior indicative of wanton cruelty accompanied the criminal acts.  After a finding that the murder was companion to such behavior, the law empowers the judge to exercise sentencing discretion within a greater range of potential punishment.  Our legislature put a higher penalty in place, ready for imposition, only in the event of such a finding. 

The federal carjacking statute and the statutory method for the imposition of a life sentence under Illinois law share common features.  Both establish tiers of punishment, with potential maximum penalties that far exceed the limits of punishment that can be imposed upon the facts that compose the jury's verdict.  The maximum penalties are clearly fixed by law, but the actual imposition of those maximum penalties turns upon factual findings removed from the jury's assessment.  The maximum penalty to which a defendant is exposed depends upon judicial findings unconstrained by the procedural safeguards that accompany a jury trial. 

The majority opinion in 
Jones v. United States
 was fashioned to avoid constitutional concerns.  In order to uphold the statute's constitutionality, the Supreme Court construed the federal carjacking statute as having established three distinct offenses, rather than a single crime with a choice of three maximum penalties, two of which turned upon sentencing factors exempt from the requirements of charge and jury verdict.  
Jones
, 526 U.S. at 252, 143 L. Ed. 2d at 331, 119 S. Ct. at 1228.  Although the majority opinion discussed the constitutional implications of treating serious bodily injury as a sentencing factor rather than a distinct element of a different crime, it upheld the statute by the approach taken.  Jones's sentence was struck down because a federal judge decided one of the crime's elements rather than Jones's jury.  

The importance of the decision to a proper understanding of the rule handed down in 
Apprendi v. New Jersey
 does not lie in the majority opinion.  Two justices in the 
Jones
 majority wrote specially in order to set forth their views on the constitutional ramifications of the statute's unique methodology.  Because the 
Apprendi
 majority expressly endorses the 
rule
 set forth in these two concurring opinions, rather than the actual holding of the opinion,
 what the concurring justices had to say assumes greater significance than the actual holding, when considering the case's import to a proper understanding of 
Apprendi
's constitutional reach.  

Justice Stevens wrote:

"[W]e 
endorse
 the statement of the 
rule
 set forth in the concurring opinions in [the 
Jones
] case:  '[I]t is 
unconstitutional
 for a legislature 
to remove from the jury the assessment of facts that increase the prescribed range of penalties
 to which a criminal defendant is exposed.' "  (Emphasis added.)  
Apprendi
, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2363 (quoting 
Jones
, 526 U.S. at 252, 143 L. Ed. 2d at 332, 119 S. Ct. at 1228 (Stevens, J., concurring)). 

This rule must be examined in light of the federal carjacking statute's intended method for the imposition of punishment.  The intended methodology is what the rule set forth by the concurring justices actually addressed.  It is not the majority's cure for the ill-conceived design that is important.  It is the design itself, deemed constitutionally infirm by Justice Stevens and Justice Scalia because Congress removed from the jury the assessment of those facts that had to exist before the greater maximum penalties that Congress provided could actually be imposed.  

The 
Apprendi
 majority could not endorse the rule set forth in the concurring opinions in 
Jones
 without extending constitutional protection against sentencing schemes that prescribe higher maximum penalties the actual imposition of which require additional factual findings removed from jury assessment.  Jones was not punished beyond the prescribed statutory maximum penalty under the federal carjacking statute's intended design.  And it was that intended design, not its cure, that the concurring justices in 
Jones v. United States
 addressed. 

We adhere to our belief that "due process and the right to a trial by jury are constitutional guarantees that various sentencing schemes can offend, depending upon how a legislature unleashes the power to punish for a given offense and whether that power is constrained in the absence of additional factual findings."  
Nitz
, 319 Ill. App. 3d at 966, 747 N.E.2d at 52.  The additional factual findings do not have to increase penalties beyond those already fixed by law and in place for use in the event of such findings.  Additional required findings of fact, removed from the jury's assessment and assigned to a judge for determination, merely have to key the authority to actually impose the punishment.  It does not matter that more severe sentences are firmly in place, as long as their actual imposition as punishment is impossible in the absence of the required findings.

Here, the Illinois legislature removed from the jury the assessment of a fact essential to the punishment imposed.  A state officer, rather than 12 fellow citizens, determined that exceptionally brutal or heinous behavior indicative of wanton cruelty accompanied the defendant's criminal acts.  The constitutional right to a trial by jury cannot abide a punishment imposed in this manner.  
Nitz
, 319 Ill. App. 3d 949, 747 N.E.2d 38.  

For several reasons, we decline
 the invitation to read Justice Freeman's statement in 
People v. Wagener
 as an indication that our supreme court will soon adopt the State's position on the first-degree-murder sentencing scheme.  Initially, as pointed out in 
People v. Wagener
, consecutive sentencing produces more punishment, but the sentences imposed relate to separate offenses.  The sentences remain discrete, despite the manner in which they must be served.  The first-degree-murder sentencing scheme increases punishment for the commission of one crime, and the increase depends upon how a judge, rather than a jury, decides a question of fact.  In addition,
 
the 
Apprendi
 majority explicitly disclaimed any holding in regard to consecutive sentencing.  Finally, that same majority expressly endorsed the rule set forth by the concurring opinion in 
Jones
 
v. United States
.  Our consecutive sentencing statute does not provide a neat fit within that rule.  However, our first-degree-murder sentencing statute does.  

Thus, the sentencing judge in this case could not validly impose a sentence of life imprisonment based upon his finding that the crime was companion to exceptionally brutal behavior indicative of wanton cruelty.  However, this does not end the inquiry.

People v. Nitz
 was not a capital case.  In capital cases, a trial court's subsequent finding that a murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty does not necessarily increase the defendant's exposure to greater punishment.  In 
People v Ford
, No. 90083, slip op. at 5 (October 18, 2001), the State sought to impose death as punishment.  The sentencing judge considered the evidence presented in aggravation at the first phase of the sentencing hearing and determined that the State established, beyond a reasonable doubt, that two circumstances qualified the defendant for a death sentence.   The trial judge declined to impose death but did impose an extended 100-year prison term, after finding that the crime was companion to brutal behavior indicative of wanton cruelty.  In upholding the extended-term sentence, our supreme court reasoned:

"*** [T]he maximum sentence facing defendant (
i.e.
, death) was established when the trial court found, 
by proof beyond a reasonable doubt
, that the murder both was committed in the course of another felony and involved the infliction of torture.  The trial court's subsequent finding that the murder 'was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty' did nothing to increase the penalty that defendant was facing."  (Emphasis added.)  
Ford
, No. 90083, slip op. at 5.  

The factual findings necessary to unleash the harsher penalty imposed had already been made under a reasonable doubt standard of proof.  Because the finding of brutal behavior companion to Ford's murder was not the finding that exposed Ford to greater penalties, the rule promulgated in 
Apprendi
 was not violated.  Factual findings made under a burden of proof commensurate with the right to a jury trial set the maximum sentence the law allowed.

  Here, the jury not only found the defendant guilty of first-degree murder beyond a reasonable doubt but also deliberated certain other facts under that same standard.  At the first phase of the capital sentencing hearing, the jury found beyond a reasonable doubt that this murder was committed in the course of a residential burglary and a robbery.  Thus, it determined that the defendant was eligible for a death sentence pursuant to section 9-1(b)(6) of the Criminal Code of 1961 (720 ILCS 5/9-1(b)(6) (West 1996)).  Section 5-8-1(a)(1)(b) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(b) (West 1996)) provides that a life sentence can be imposed if the court finds that any of the aggravating factors found in subsection (b) of section 9-1 of the Criminal Code of 1961 (720 ILCS 5/9-1(b) (West 1996)) are present.

We can affirm the trial judge's judgment on any grounds warranted by the record, regardless of the trial judge's stated reasons for ruling.  
People v. Nash
, 173 Ill. 2d 423, 432, 672 N.E.2d 1166, 1170 (1996).  Here, based upon the jury's finding at the first phase of the sentencing hearing, the trial judge could have found the existence of an aggravating factor under section 9-1(b) and sentenced the defendant to life imprisonment without running afoul of our decision in 
People v. Nitz
.  
People v. Nitz
 stands for the proposition that the right to a trial by jury guarantees the right to have fellow citizens determine those facts that determine the maximum sentence the law will allow.  Since a jury determined beyond a reasonable doubt those facts that exposed the defendant to a life term, the defendant received all that the right to a trial by jury assures.  See 
People v. Sims
, ___ Ill. App. 3d ___, ___, 750 N.E.2d 320, 336 (2001).  Hence, the trial judge's imposition of a life sentence need not be invalidated.

For the foregoing reasons, the judgment of the circuit court of Williamson County is hereby affirmed.

Affirmed.

HOPKINS and CHAPMAN
(footnote: 1), JJ., concur.

NO. 5-99-0166

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Williamson County.  

)

v. ) No. 98-CF-370

)

GARY DEAN LEE, ) Honorable

) Donald Lowery, 

Defendant-Appellant. ) Judge, presiding.  

________________________________________________________________________________________________

Opinion Filed
: October 26, 2001

________________________________________________________________________________________________

Justices
: Honorable Clyde L. Kuehn, J.

Honorable Melissa A. Chapman, J., and

Honorable Terrence J. Hopkins, J.,

Concur

________________________________________________________________________________________________

Attorneys
 Daniel M. Kirwan, Deputy Defender, Dan W. Evers, Assistant Defender,

for
 Office of the State Appellate Defender, Fifth Judicial District, Route 15

Appellant
 East, P. O. Box 2430, Mt. Vernon, IL  62864

________________________________________________________________________________________________

Attorneys
 Hon. Michael Wepsiec, State's Attorney, Jackson County Courthouse,

for
 Murphysboro, IL  62966; Norbert J. Goetten, Director, Stephen E. Norris,

Appellee
 Deputy Director, Kendra S. Peterson, Staff Attorney, Office of the State's

Attorneys Appellate Prosecutor, Route 15 East, P. O. Box 2249, Mt. Vernon,

IL  62864

________________________________________________________________________________________________

FOOTNOTES
1:
Justice Charles Chapman participated in oral argument.  Justice Melissa Chapman was later substituted on the panel and has read the briefs and listened to the audiotape of oral argument.  

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 10/26/01.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.