THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL QUINTERO, Defendant-Appellant.

Third District    No. 3—08—0153

Opinion filed September 8, 2009.

Fletcher P. Hamill, of State Appellate Defender's Office, of Ottawa, for appellant.

James Glasgow, State's Attorney, of Joliet (Terry A. Mertel and Robert M. Hansen, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CARTER delivered the opinion of the court:

A jury convicted the defendant, Paul Quintero, of first degree murder (720 ILCS 5/9—1(a)(2) (West 2000)), and the trial court sentenced him to a term of natural life in prison. The defendant appeals, arguing that the trial court abused its discretion when it admitted other-crimes evidence. We reverse and remand.

FACTS

On July 26, 2006, the defendant was charged with two counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 2000)) for the shooting death of Darnell Washington on November 2, 2001.

On May 23, 2007, the State filed a motion to admit other-crimes evidence. The State sought to admit evidence about the defendant's 2003 first degree murder of Michael Ceja to show intent, identity,

*modus operandi,* common scheme or plan, and knowledge. The State alleged the following similarities between the two murders: (1) male victims; (2) early morning shootings; (3) the defendant carried and fired a firearm; (4) victims shot seven to eight times and in a similar manner; (5) plans to kill originated with the defendant; (6) victims left in a roadway; (7) the defendant isolated each victim by taking each to a location where it was unlikely that anyone would witness the murders; (8) the defendant relied on a fellow gang member to drive him from the crime scene; (9) the defendant traveled in the same car as the victim prior to the murders; (10) the defendant was in the Joliet area prior to the murders; and (11) the murders happened about 20 months apart.

On June 21, 2007, the defendant filed a motion *in limine,* seeking to exclude evidence of the Ceja murder. The defendant argued that evidence of the conviction would be unfairly prejudicial to him as it was not relevant to show motive, intent, identity, absence of mistake, common scheme, or *modus operandi.* Specifically, with regard to *modus operandi,* the defendant pointed to differences between the Ceja and Washington murders: (1) the murders happened 20 months apart; (2) the murders occurred three miles apart; (3) different vehicles were involved; (4) the vehicle in the Ceja murder belonged to an accomplice whereas the vehicle in the Washington murder belonged to the victim; (5) the vehicle in the Washington murder was burned and the vehicle in the Ceja murder was not burned; (6) Ceja was Hispanic and Washington was African-American; (7) Ceja was a member of the defendant's gang and Washington was a member of a rival gang; and (8) the Ceja murder was the result of an argument about a woman and the Washington murder was allegedly gang related.

The trial court granted the State's motion to admit other-crimes evidence. The record contains no docket entry or transcript of the motion hearing.

After a mistrial, the defendant's trial began on October 29, 2007, on one count of first degree murder (720 ILCS 5/9—1(a)(2) (West 2000)).[1] During opening statements, the State stated that it would introduce evidence of the Ceja murder to show the defendant's *modus operandi.*

The State's evidence showed that the police found Washington on November 2, 2001, at about 4 a.m. on Farrell Road, an unlit rural road surrounded by a wooded area and farmland. Washington showed no signs of life, and his body was surrounded by shattered glass from a

---

[1]The State dismissed the other count of first degree murder (720 ILCS 5/9—1(a)(1) (West 2000)) prior to the trial.

car window. The police found one 9-millimeter shell casing at the scene and a .38-caliber semiautomatic pistol in the pocket of Washington's pants.

Forensic evidence showed that Washington had eight gunshots to the right side of his face and single gunshots to his right neck, right shoulder, right chest, and left chest. The forensic evidence further showed that Washington was shot from a range greater than two feet at a point perpendicular to the right side of his body. Washington's injuries were consistent with a situation in which he was shot by someone outside the front passenger door of a sport utility vehicle (SUV) while he sat in the driver's seat. The parties stipulated that the fired bullets and cartridge cases found in and around Washington's body were 9-millimeter bullets and cartridge cases fired from the same firearm.

At about 12 p.m. on the same day Washington's body was found, the police found Washington's SUV on a dead-end street in an industrial area of Joliet. The SUV had been set on fire, and the interior of the vehicle had extensive fire damage. Despite the damage, the police found a shell casing near the front passenger seat and two rounds on the driver's side of the vehicle. Later that day, the police recovered charred clothing behind a garage on Landau Street in Joliet.

Joseph Gonzales testified that he was currently in prison. He was convicted of arson for burning Washington's SUV. Gonzales also was charged with the first degree murder of Washington, but he reached a plea agreement with the State. Gonzales pled guilty to aggravated discharge of a firearm in exchange for a 15-year sentence in prison and his testimony in this case.

Gonzales testified that on November 1, 2001, he was at Heroes and Legends, a bar in Joliet, at about 10 or 11 p.m. with the defendant, the defendant's brother, Mario, Salvador Rangel, and Fernando Hernandez. Washington was also at the bar with another group of people, and he joined Gonzales's group when Rangel, who knew Washington from school, invited him. Gonzales testified that he, Rangel, and Michael Pantoja had had a gang-related shootout with Washington and his friends a couple of months earlier.

When Heroes and Legends closed, everyone decided to go to another bar, O'Charley's, but it closed as well. Everyone then went to Christina Ortiz's house on Landau Street for a party. Gonzales testified that he was at Ortiz's party when he heard a gunshot. He went outside and saw the defendant and Mario. Mario had a 9-millimeter handgun and told Gonzales that he was shooting at a cat in the alley. The defendant grabbed the gun and told Gonzales that he wanted to kill Washington. Gonzales told the defendant that he wanted no part

of it. Gonzales testified that he gave a written statement to the police on November 8, 2001, and he told them that the defendant made a threat against Gonzales's family after Gonzales told him that he did not want to participate in the killing.

Gonzales testified that the defendant and Washington decided to go to another party. As the defendant and Washington were getting into Washington's SUV, Gonzales asked them for a ride to his mother's house. Washington drove, the defendant was in the front passenger seat, and Gonzales was in the backseat behind Washington. Hernandez followed Washington's SUV in his own car.

Gonzales testified that the defendant directed Washington where to go. The defendant told Washington to go in the opposite direction of the house of Gonzales's mother and directed Washington to Farrell Road. On Farrell Road, the defendant asked Washington to pull over so he could urinate. When Washington pulled over, the defendant got out of the vehicle, turned, and began shooting at Washington. Gonzales testified that, after the defendant fired 10 to 14 shots, his face and clothes were covered with blood.

After the shooting, the defendant got into Hernandez's car and drove away. Gonzales took Washington's body out of the SUV and drove away in the SUV. Gonzales caught up with the defendant and Hernandez and told them that they needed to burn the SUV. Gonzales, followed by the defendant and Hernandez in Hernandez's car, took the SUV to several houses looking for gasoline. Gonzales went to Rangel's house, but Rangel did not have gasoline. However, Rangel told Gonzales that he should wash the blood off his face, which Gonzales did. Gonzales eventually found some gasoline at Hernandez's house, where he also cleaned out any shell casings he could find in the SUV. Gonzales drove the SUV to a secluded dead-end street, and he and the defendant set it on fire. Gonzales and the defendant then returned to Landau Street, where Gonzales burned his bloody clothes in an alley.

On cross-examination, Gonzales stated that the defendant threatened him after the shooting as the defendant walked toward Hernandez's car. Gonzales was also questioned about statements he made about the events surrounding Washington's murder. Gonzales stated that he talked to the police twice on November 7, 2001. The first time he talked to the police he told them that he went to Heroes and Legends and O'Charley's but that he left O'Charley's with a woman. He also told them that he did not know Washington. The second time Gonzales spoke with the police, Gonzales told them that he went to Ortiz's party, that he went to Rangel's house after the shooting, and that he washed the blood off his face at Rangel's house.

Gonzales testified that he made another statement to the police in December 2001 and that he told the police that he and Pantoja disposed of the gun used to shoot Washington. In July 2002 at his arson trial, Gonzales testified that he only made his second statement to the police on November 7 because they hit him and he feared further abuse. Gonzales's plea agreement included a promise that he would not be charged with perjury for his testimony in his July 2002 arson trial.

Gonzales testified that he wrote a letter to the police in early 2007. He stated in the letter that the defendant informed him on October 31, 2001, that he was planning to kill someone and that he thought the defendant's motive for the killing was a dispute over a woman. Gonzales had not mentioned this information prior to this letter. In August 2007, Gonzales told the State about his prior shootout with Washington for the first time.

Rangel testified that he went to Heroes and Legends on November 1, 2001, at about 10 p.m. with the defendant, Mario, and Gonzales. While there, Rangel invited Washington, whom he had known from high school, to have drinks with him and the others. When Heroes and Legends closed, the group went to O'Charley's and then a party at Ortiz's house. At the party, Rangel saw the defendant with a gun in his waistband. Rangel left the party at about 3 a.m. and went home. He was later awakened by a phone call from Gonzales, who indicated that they had killed Washington and that he was coming to Rangel's house. When Gonzales arrived at Rangel's house, he had "speckles" of blood on his face, which Rangel told him to wash off. Rangel testified that Gonzales asked him for gasoline to burn Washington's SUV, but he did not have any gasoline. Washington's SUV was parked in front of Rangel's house along with Hernandez's car. The defendant and Hernandez remained in Hernandez's car while Gonzales and Rangel spoke.

Hernandez testified that he was at home and not with the defendant, Gonzales, or Rangel in the early morning of November 2, 2001. However, he admitted that he pled guilty to arson for burning Washington's SUV. The parties stipulated that Hernandez was being treated for schizophrenia, paranoid type, and that he had symptoms, such as hallucinations, difficulty concentrating, and forgetfulness.

Domenica Duarte testified that she had an intermittent relationship with the defendant in 2001. She denied that the defendant asked her to tell the police that they had been together on the evening of November 1, 2001, and she did not recall telling the police that the defendant had done so.

Detective Dean Morelli of the Will County sheriff's department testified that he assisted with the Washington murder investigation and that he interviewed Duarte on November 5, 2001. Duarte gave him a handwritten statement in which she stated that the defendant asked her on November 2, 2001, to tell the police that they were together the night before because someone had gone missing. Duarte's statement was admitted as substantive evidence.

James Skeen, a deputy sheriff for Clayton County sheriff's department in Jonesboro, Georgia, testified that he arrested the defendant on December 5, 2001, pursuant to a Joliet, Illinois, warrant for another offense. Skeen arrested the defendant in a hotel near the Atlanta airport. When Skeen and the other officers entered the defendant's hotel room, the defendant said, "all right, you got who you're looking for."

Raymond Disera testified that he had known the defendant for about 20 years and that they were in the same gang. Disera testified that he was with the defendant and Ceja during the early morning of March 15, 2000. At that point, the trial court admonished the jury that Disera would testify about another offense involving the defendant and that the evidence could only be considered for the issue of *modus operandi*.

Disera continued his testimony and stated that at about 1 a.m. on March 15, 2000, he, the defendant, and Ceja were in his car driving on the east side of Joliet. Disera was driving the car, the defendant was in the front passenger seat, and Ceja was in the backseat. Disera testified that the defendant had a .38-caliber revolver and that Ceja had a .357-caliber revolver. According to Disera, the defendant was aware that Ceja was armed.

As Disera drove, the defendant asked him to stop so that he could urinate. Disera stopped in an alley, and everyone exited the vehicle. Disera began to urinate toward an open field, and he heard the defendant and Ceja arguing near the back of the car. Disera then heard gunshots, looked back, and saw the defendant running up to Ceja, who had fallen to the ground. The defendant took Ceja's revolver and began to fire it toward Ceja. The defendant told Disera that they needed to leave, and Disera and the defendant drove off. They made no attempt to hide Ceja's body.

During cross-examination, the trial court held a sidebar and expressed concerns about whether Disera's testimony was sufficient to be used as evidence of *modus operandi*. The trial court stated that it did not hear the similarities between the two offenses that the State represented at the pretrial hearing. Specifically, the trial court expected to hear: (1) the victims had been drinking; (2) the victims

had been invited into a car by the defendant and a friend; (3) the victims were shot in the car and then their bodies were taken out and left in the roadway; and (4) the defendant used a single weapon. The defendant moved to strike Disera's testimony.

The State explained that it did not elicit other testimony from Disera because it may have been prejudicial to the defendant as it was gang-related. The other evidence would have shown that: (1) the defendant and Ceja were drinking at a party at Latin Kings headquarters; (2) the defendant and Ceja had an ongoing argument prior to the shooting; and (3) the defendant, Disera, and Ceja were patrolling the neighborhood for rival gangs before the shooting. The State did not believe this evidence was necessary because the Ceja murder and the instant murder were the only cases it had seen that mimicked a murder scene from "The Godfather." The trial court responded that *modus operandi* evidence must be strikingly similar and cited *People v. Lurry*, 77 Ill. App. 3d 108, 395 N.E.2d 1234 (1979), as another case where the defendant shot a victim after pulling a car over so that he could urinate. The trial court took the matter under advisement, and the defendant did not continue cross-examination of Disera.

The trial court returned to the issue of the other-crimes evidence. Once again, the trial court indicated that it was not satisfied with the disparities between the State's pretrial representations of Disera's testimony and the testimony at trial because the crimes had to share distinctive features for the other crime to be used as *modus operandi* evidence. The trial court stated:

"The representations made to me—I'm not saying they were ill-made—were that both crimes occurred when there was drinking at a party, when the alleged victim was convinced to leave the party with the defendant and a third individual. When these individuals got into a car, were driven to a certain location, the defendant stated he had to urinate and he left the car, he turned, basically executed the victim, and left the body on the road and with the victim being shot a number of times.

There are dissimilarities certainly based on the evidence I have heard as in these two cases, unlike what I thought. When the defendant stated in the first case, I have to urinate, all three men got out of that car. An argument then ensued, according to the State's own witness Mr. Disera, between the victim and [the defendant]. It's at that point that he opens fire, [the defendant]. After shooting him numerous times, he then goes over, takes the deceased's gun in which the victim had on him, and uses that gun to shoot him.

That's not what we have here. The location of both of the victims in each of these cars is different. In the first case or the case used

for *modus operandi*, the defendant got back into the car, as I understand it, with the third or living witness and left the scene leaving the body. In our case, he left the scene in a different car and left the so-called murder vehicle in the hands of Mr. Gonzales.

I have no evidence in this case that defendant was—had asked the victim to leave a party that there was drinking going on before the murder took place. I also was under the impression—It might have been my impression. My fault—that the murder weapon used was one weapon. Which as it was presented to me in the pretrial motion—That's the problem with assuming. Maybe I made the assumption that the defendant got out with, immediately turned, and opened fire. That's not the way it went in the case that we heard presented to this jury for proof of other crimes.

\*\*\*

So what do I have that's similar? I have got three men in a car each time. I have got three men each time late at night taken to an isolated area. I have got three men that stop the car. Both cases, the defendant says he has to urinate, although, I have a strong question in my mind about the initial reason to stop and this reason. But in any event, he exits the car, and shortly thereafter, begins to fire at the victims. Both cases, even though two different weapons are used in the first one and one is used in this one, striking him numerous times.

The point I'm getting at is there's such a striking similar crime to the first that it would compel the trier of fact to have it be listened to. Close.

There's another issue that I kept looking at. That is the issue of identification. All I have got in this case in chief thanks to Mr. Hernandez who apparently went blank who gave us nothing—[the victim's SUV] didn't really offer much. The girlfriend didn't talk about anything as to the identity of [the defendant] being the killer. When you think about it, it's just Gonzales.

So that person takes the stand with a number of felony convictions and he says the defendant did it. State is obviously compelled to prove the identification of the defendant. There isn't any issue in terms of proving intent based on the number of times that these two men were shot to death. No doubt about that. Was it clearly a homicide? You bet.

State is really compelled to prove that [the defendant] committed the act. The similarities and the requirement to establish the identification of the defendant is sufficient in my mind to allow the witness—the testimony to stand. And defense motion is denied."

The State rested its case following the trial court's decision.

In the defendant's case, three stipulations were presented. The first stipulation concerned Gonzales's first interview with the police of

November 7, 2001. It stated that Gonzales: (1) never mentioned that the defendant threatened him at gunpoint; (2) never mentioned that he removed shell casings from Washington's SUV; (3) stated that he, the defendant, Mario, Rangel, and Hernandez were at Heroes and Legends on November 1, 2001, but Gonzales did not go with them and did not associate with them while he was there; (4) stated that he met a woman at O'Charley's in the early morning of November 2, 2001, and spent the night at her house; and (5) stated that he did not attend Ortiz's party because he was with the aforementioned woman.

The second stipulation concerned Gonzales's second interview with the police on November 7, 2001, and his interview with them in December 2001. With regard to the second interview on November 7, 2001, the stipulation stated that Gonzales: (1) never mentioned that the defendant threatened him at gunpoint; (2) never mentioned that he removed shell casings from Washington's SUV; (3) stated that he met Washington, Hernandez, and Ortiz at Heroes and Legends; and (4) stated that the defendant or Hernandez contacted Rangel after the shooting of Washington and that they told Rangel that they killed Washington. With regard to the December 2001 interview, the stipulation provided that Gonzales: (1) never mentioned that the defendant threatened him at gunpoint; (2) never mentioned that he removed shell casings from Washington's SUV; (3) stated that he believed that Washington was murdered because Washington had been involved in a prior shootout with Gonzales; (4) stated that Rangel told Gonzales, the defendant, Mario, and Hernandez at Heroes and Legends that Washington was one of the persons that shot at them in the prior shootout; (5) stated that he was instructed by the defendant to sit behind Washington in Washington's SUV and to grab Washington if he tried to reach for his gun; (6) stated that he, the defendant, and Hernandez invited Washington to another party while at Ortiz's party and that there was no other party; (7) stated that he sat behind Washington as planned; and (8) stated how he and Pantoja disposed of the gun.

The final stipulation, regarding Gonzales's testimony at his July 2002 arson trial, provided: (1) Gonzales testified that during his second interview with the police on November 7, 2001, the police informed him that he would be charged with murder if he did not cooperate; and (2) Gonzales testified that, during the same interview, the police told him that they would recommend five years of probation if he cooperated. The defendant rested.

The State did not mention Disera's other-crimes testimony during closing or rebuttal closing arguments. In closing argument, the defendant stated that the facts of the Ceja murder were not similar to the Washington murder.

The trial court gave the jury Illinois Pattern Jury Instructions, Criminal, No. 3.14 (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000)):

"Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment.

This evidence has been received on the issues of the defendant's identification and *modus operandi* and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issues of identity and *modus operandi*."

The trial court also instructed the jury that *modus operandi* "refers to a method of working, a pattern of criminal behavior that is so distinct that separate crimes or wrongful conduct is recognized as being the work of the same person."

The jury found the defendant guilty of first degree murder (720 ILCS 5/9—1(a)(2) (West 2000)). On December 14, 2007, the defendant filed a motion for a new trial, arguing, *inter alia*, that the trial court erred when it granted the State's motion to admit other-crimes evidence and denied his motion *in limine* to exclude other-crimes evidence and his motion to strike Disera's testimony. On February 29, 2008, the trial court denied the motion and sentenced the defendant to a term of natural life in prison.

The defendant appeals.

## ANALYSIS

On appeal, the defendant argues that the trial court abused its discretion when it admitted other-crimes evidence about the Ceja murder to show the defendant's identity and *modus operandi*.

Other-crimes evidence is inadmissible to show the defendant's criminal propensity. *People v. Wilson*, 214 Ill. 2d 127, 824 N.E.2d 191 (2005). Propensity evidence is inadmissible because it has so much probative value that it may convince a jury to convict a defendant because he or she is a bad person and deny the defendant a fair opportunity to defend against the charged offense. *People v. Robinson*, 167 Ill. 2d 53, 656 N.E.2d 1090 (1995). However, other-crimes evidence is admissible for any purpose other than propensity, such as *modus operandi*, intent, identity, motive, or absence of mistake. *Wilson*, 214 Ill. 2d 127, 824 N.E.2d 191.

When other-crimes evidence is offered for such a relevant purpose, it is admissible only when the other crime has a threshold similarity to the charged crime. *People v. Cruz*, 162 Ill. 2d 314, 643 N.E.2d 636 (1994). The threshold requirement increases the relevancy of the evidence and ensures that it is not used solely to establish the

defendant's criminal propensities. *Cruz*, 162 Ill. 2d 314, 643 N.E.2d 636.

In cases where the other-crimes evidence is offered for some purpose other than *modus operandi*, general areas of similarity are sufficient. *Cruz*, 162 Ill. 2d 314, 643 N.E.2d 636. However, in cases where the evidence is offered to show *modus operandi*, a high degree of factual similarity is required between the charged crime and the other crime. *Robinson*, 167 Ill. 2d 53, 656 N.E.2d 1090; *Cruz*, 162 Ill. 2d 314, 643 N.E.2d 636. This high degree of factual similarity is necessary because *modus operandi* "refers to a pattern of criminal behavior so distinctive that separate crimes are recognized as the handiwork of the same wrongdoer." *Cruz*, 162 Ill. 2d at 349, 643 N.E.2d at 653. The crimes must have distinctive features that are not common to most offenses of that type. *People v. Phillips*, 127 Ill. 2d 499, 538 N.E.2d 500 (1989). Distinctive links may be found in evidence that the defendant used similar weapons, dressed the same, acted with the same number of people, or used a distinctive method of committing the particular offense. *Phillips*, 127 Ill. 2d 499, 538 N.E.2d 500. Nonetheless, despite the necessity of a persuasive showing of similarity when other-crimes evidence is offered to show *modus operandi*, there is a recognition that some dissimilarity will always exist between independent crimes. *Robinson*, 167 Ill. 2d 53, 656 N.E.2d 1090; *Cruz*, 162 Ill. 2d 314, 643 N.E.2d 636. We review a trial court's decision to admit other-crimes evidence for an abuse of discretion. *Wilson*, 214 Ill. 2d 127, 824 N.E.2d 191.

In this case, the trial court initially admitted Disera's other-crimes testimony to show the defendant's *modus operandi*, as it so instructed the jury prior to his testimony. After the trial court expressed concerns about whether Disera's testimony was sufficient to be used as evidence of *modus operandi* and the defendant moved to strike Disera's testimony, the trial court admitted the testimony to show the defendant's identity but did not expressly rule on its admissibility as to the defendant's *modus operandi*. Ultimately, the trial court permitted the jury to consider the other-crimes evidence to show the defendant's identity and *modus operandi* as evidenced by its jury instruction.

The use of other-crimes evidence to show *modus operandi* and identity are related in that they both serve to identify the defendant as the perpetrator of the offense at issue, but they work in different ways. "The *modus operandi* exception has been described as circumstantial evidence of identity on the basis that crimes committed in a similar manner suggest a common author and strengthens the identification of the defendant." *People v. Shief*, 312 Ill. App. 3d 673, 681, 728 N.E.2d 638, 645 (2000); see also M. Graham, Cleary &

Graham's Handbook of Illinois Evidence §404.5, at 231 (9th ed. 2009) (stating that proof of *modus operandi* is admissible to establish identity). The use of other-crimes evidence to show identity, on the other hand, links the defendant to the offense at issue through some evidence, typically an object, from the other offense. See *People v. Coleman*, 158 Ill. 2d 319, 633 N.E.2d 654 (1994) (finding that the defendant was linked to the victim's murder because the gun used to kill the victim was the same gun that the defendant used to kill another person); see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §404.5, at 229 (9th ed. 2009) (stating that the identity of an object may be used to link a defendant to a crime). Accordingly, as mentioned above, other-crimes evidence used to show identity requires a less substantial showing of similarity than other-crimes evidence used to show *modus operandi*.

The trial court found that the similarities between the other offense and the charged offense—the same similarities used to justify the use of the evidence to show *modus operandi*—were sufficient to admit the evidence to show the defendant's identity. Such similarities, however, were not sufficient to justify the use of the other-crimes evidence to show identity, because the other-crimes evidence could not be used to show identity in any respect. The other-crimes evidence did not connect the defendant to the charged offense at issue through some object evidence from the other offense, and therefore, we find that the trial court abused its discretion in admitting the other-crimes evidence to show identity. If the other-crimes evidence connected the defendant to the charged offense, it was through the similar manner in which the crimes were committed, *i.e.*, *modus operandi* evidence. To allow this other-crimes evidence under a less substantial showing of similarity undercut and eliminated the requirement of a high degree of factual similarity for other-crimes evidence showing *modus operandi*. Thus, we must determine whether there was a high degree of factual similarity between the charged crime and the other crime.

The State argues that the "high degree of identity was essentially the defendant claiming the need to urinate in an isolated area and then shooting the victim before leaving him and driving away." This factual similarity is not so distinctive, considering a similar factual scenario occurred in "The Godfather" and *Lurry*, 77 Ill. App. 3d 108, 395 N.E.2d 1234. It also ignores the substantial difference between the two offenses: (1) the defendant, victims, and a third party were all in a car prior to both shootings, but another car followed them in the Washington murder; (2) the defendant convinced Washington to drive

to another party, but there is no admitted evidence[2] as to how Ceja got into a car with the defendant; (3) after Washington pulled the car over, only the defendant exited the vehicle, but in the Ceja murder, all the occupants exited the vehicle; (4) the defendant immediately shot Washington, but the defendant shot Ceja after an argument; (5) the defendant shot Washington while Washington was in the car whereas he shot Ceja outside the car; (6) the defendant shot Washington with a single gun whereas he shot Ceja with his own gun and Ceja's gun; (7) the Washington murder occurred in a rural area whereas the Ceja murder occurred in an alley in Joliet; (8) the defendant left behind Gonzales and Washington's SUV after shooting Washington, but he did not leave behind anything after the Ceja murder; and (9) the defendant burned Washington's SUV after the murder but did not dispose of Disera's car after the Ceja murder. These differences between the two offenses outweigh the unremarkable similarities—the time of day of the murders, the number of shots fired, the victims left lying in the road, and the defendant's request to pull the car over so he could urinate—such that there was no demonstrated pattern of criminal behavior so distinctive that the separate crimes could be recognized as the handiwork of the defendant. The trial court abused its discretion when it admitted the other-crimes evidence to show *modus operandi*.

Although we find that the trial court abused its discretion in admitting the other-crimes evidence, we must still determine whether the error was harmless. The improper admission of other-offenses evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial because of its admission. *People v. Evans*, 209 Ill. 2d 194, 808 N.E.2d 939 (2004); *People v. Nieves*, 193 Ill. 2d 513, 739 N.E.2d 1277 (2000). The State bears the burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the error. *People v. Herron* 215 Ill. 2d 167, 830 N.E.2d 467 (2005).

The evidence of the defendant's guilt was not overwhelming, and the improper admission of other-offenses evidence may have led the jury to find the defendant guilty. The State did not have physical evidence and, apart from the other-offenses evidence, relied on Gonzales's testimony. The outcome of the trial depended on Gonzales's cred-

---

[2]As mentioned in the recitation of facts, the State explained that it had evidence that Ceja was in the car with the defendant to patrol the neighborhood for rival gangs before the shooting. The State's explanation did not indicate that the defendant lured Ceja into the car, and even if it did, it would not be similar to the defendant's alleged actions in the Washington murder.

ibility. Gonzales's testimony directly implicated the defendant, but, as the trial court mentioned, Gonzales's credibility was suspect because he told the police multiple versions of what happened and because he was involved in the offense in some way. In exchange for his testimony, Gonzales escaped a charge of first degree murder and pled guilty to lesser offenses for his actions in this case. He had a strong incentive to implicate the defendant.

Contrary to the State's arguments, the evidence about the defendant's arrest in Atlanta, purportedly showing consciousness of guilt, and his comments to Duarte did not constitute overwhelming evidence of guilt. Based on the evidence presented, the defendant may have fled to Atlanta for a number of reasons. In this case the State has not met its burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the error. The admission of the other-offenses evidence was not harmless, and we remand for a new trial.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Will County and remand the cause for further proceedings.

Reversed and remanded.

O'BRIEN, P.J., and HOLDRIDGE, J., concur.