**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240290-U

Order filed April 24, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0290 Circuit No. 06-CF-1899 |
| PAUL QUINTERO, | ) ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    The circuit court did not err in dismissing defendant's postconviction petition at the second stage of proceedings.

¶ 2    Defendant, Paul Quintero, appeals the dismissal of his postconviction petition at the second stage of proceedings. Specifically, defendant argues that he made a substantial showing that (1) appellate counsel was ineffective for failing to argue on direct appeal that defendant was prejudiced by the jury viewing him in shackles, (2) trial counsel was ineffective for failing to investigate the layout of Stateville Correctional Center to impeach a witness's testimony, and

(3) postconviction counsel provided unreasonable assistance where he failed to attach necessary documentation to adequately present defendant's claims. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On July 26, 2006, defendant was charged with two counts of first degree murder (720 ILCS 5/9-1(a)(2) (West 2000)) stemming from the November 2, 2001, shooting death of Darnell Washington. Initially, we note that the facts of this case have been previously set forth in detail in defendant's two prior appeals. *People v. Quintero*, 394 Ill. App. 3d 716, 717-25 (2009); *People v. Quintero*, 2012 IL App (3d) 100857-U, ¶¶ 4-15. We have relied on these previous cases, in conjunction with the record, to summarize the facts relevant to this appeal.

¶ 5        Defendant was initially convicted of first degree murder following a 2007 jury trial. We reversed and remanded for a new trial based on the admission of improper other-crimes evidence. *Quintero*, 394 Ill. App. 3d at 729. Defendant was retried in 2010. The evidence at trial established that the police found Washington on November 2, 2001, at approximately 4 a.m. on a rural road in the outskirts of Joliet. Forensic evidence showed that Washington had been shot 11 times on the right side of his body from a range greater than two feet. His injuries were consistent with being shot by someone outside the front passenger door of an SUV, while Washington was in the driver's seat. The parties stipulated that the fired bullets and cartridge cases found in and around Washington's body were fired from the same 9-millimeter firearm. Later that same day, the police located Washington's SUV in an industrial area. The SUV had been set on fire and its interior sustained extensive fire damage. One shell casing was found near the front passenger seat, and two rounds were lodged in the driver's side of the SUV.

¶ 6        Joseph Gonzales testified that he had been convicted of arson for burning Washington's SUV. Gonzales had also been charged with the first degree murder of Washington but reached a

2

plea agreement with the State. Gonzales pled guilty to aggravated discharge of a firearm in exchange for 15 years' imprisonment and his testimony in this case. He stated that he had been released from prison on June 18, 2010, following the completion of that sentence.

¶ 7 On the evening of November 1, 2001, Gonzales, defendant, Salvador Rangel, Fernando Hernandez, and defendant's brother, all of whom were Latin Kings, went to a bar. Washington was also present at the bar. Despite a recent gang-related shootout between Washington and Gonzales, Washington joined Gonzales's group at the bar. After the bar closed, they all went to a party at the residence of Christina Ortiz. While there, Gonzales heard gunshots from the backyard. He indicated that defendant's brother was firing at a cat. Defendant took the firearm, a black 9-millimeter handgun, from his brother and placed it in his waistband. Sometime later, defendant told Gonzales that he intended to kill Washington. Eventually, Gonzales and defendant left the party. They rode with Washington in his SUV. Defendant was in the front passenger seat and Gonzales was seated in the rear passenger seat, behind Washington. Hernandez followed them in his own vehicle.

¶ 8 Defendant directed Washington to a rural area. Defendant asked Washington to pull over so he could urinate. Seconds after exiting the SUV, defendant began to shoot through the open passenger window. Gonzales stated that defendant fired between 10 and 14 shots at Washington. Defendant then entered Hernandez's vehicle and left the scene. Gonzales removed Washington's body from the SUV and drove away in the SUV. Gonzales obtained gasoline and drove the SUV to an industrial area, where he and defendant set it on fire. The next day, Gonzales retrieved the 9-millimeter gun from defendant, dismantled it, and threw the pieces into the river. He testified that he did this to protect defendant who was his friend and a fellow Latin Kings member.

¶ 9        Gonzales was questioned regarding statements he made about the events surrounding Washington's murder. Gonzales stated that he spoke to the police twice on November 7, 2001. During the first interview, he lied to the police, saying that he was with a woman and not at the bar. Further, he indicated he did not know Washington. In the second interview, Gonzales told them that he went to Ortiz's party and then to Rangel's house after the shooting to wash the blood off his face. Gonzales provided a four-page written statement to the police. At Gonzales's arson trial in July 2002, he testified that he only spoke with police a second time on November 7 because they hit him and he feared further abuse. Gonzales's plea agreement included a promise that he would not be charged with perjury for his testimony in his July 2002 arson trial.

¶ 10        Prior to being paroled, Gonzales was transported to Stateville in anticipation of this case going to trial. He explained that he was being held on the third tier of M house which is located next to N house. Gonzales admitted to lying to inmates about why he was there. While there, Gonzales heard someone call his name and he approached his cell door. Gonzales explained that M house and N house are separated by a large wall. He could not see the person who was speaking but they identified themselves as "Sneaky," which Gonzales knew to be a nickname used by defendant. The individual told Gonzales to "look out for him." Gonzales took this to be a request to "[t]ake the rap" for the murder. Gonzales described the layout of the housing units. He indicated that defendant was in N house. Gonzales testified that he told various lies to mislead defendant to believe that he intended to testify on his behalf.

¶ 11        During a lengthy cross-examination, Gonzales testified that defendant threatened him at gunpoint after the shooting as defendant walked toward Hernandez's vehicle. Trial counsel questioned Gonzales regarding his inconsistent statements to the police and at trial, his lies under oath, and his omissions. Gonzales testified that he remained silent during the first interview on

4

November 7. When questioned about his interaction with "Sneaky" in Stateville, he acknowledged that the individual never identified himself as defendant and Gonzales did not recognize the voice until it identified itself by the nickname "Sneaky." Gonzales acknowledged that the first level of tiers could not be seen from his position on the third tier. He also acknowledged that he was not supposed to have contact with defendant and did not report this contact to the guards. Gonzales testified that there could be as many as 120 people in M housing and it can become "pretty loud sometimes *** with all the people talking."

¶ 12        In defendant's case, three stipulations were presented. The first stipulation concerned Gonzales's first interview with the police of November 7, 2001. It stated that Gonzales: (1) never mentioned that defendant threatened him at gunpoint; (2) never mentioned that he removed shell casings from Washington's SUV; (3) said that he, defendant, Rangel, Hernandez, and defendant's brother were at the bar on November 1, 2001, but Gonzales did not go with them or associate with them while he was there; (4) said he met a woman at another bar in the early morning of November 2, 2001, and spent the night at her house; and (5) said he did not attend Ortiz's party because he was with the aforementioned woman.

¶ 13        The second stipulation concerned, in pertinent part, Gonzales's second interview with the police on November 7, 2001. The stipulation stated that Gonzales: (1) never mentioned that defendant threatened him at gunpoint; (2) never mentioned that he removed shell casings from Washington's SUV; (3) said he met Washington, Hernandez, and Ortiz at the bar; and (4) said that defendant or Hernandez contacted Rangel after the shooting and told him they killed Washington.

¶ 14        Gonzales's four-page written statement from November 7, 2001, was admitted into evidence without objection. The court questioned trial counsel about his decision not to object, as the written statement was a prior consistent statement which was presented to Gonzales during his

5

direct examination. Trial counsel explained that he did not object as a matter of trial strategy because he intended to "impeach [Gonzales] by omission" on cross-examination with statements counsel knew were not included in his written statement that he "specifically did not tell the police at the time." Trial counsel explained that he knew which direction he intended to go with his cross-examination and "knew [the written statement] was going to come in if not on cross, on redirect."

¶ 15        Defendant was again convicted of first degree murder and sentenced to a term of natural life in prison. Defendant filed a motion for a new trial which alleged, in part, that "the Court erred in allowing Defendant to be seen by the jury in shackles following announcement of their verdict but prior to completion of their polling." During the hearing on this motion, trial counsel explained that he did not notice defendant was still shackled until after he announced ready and the court called for the jurors to be brought into the courtroom. The record of the verdict reading contains no mention of defendant remaining shackled. The court denied the motion. On appeal, defendant argued only that court erred in allowing improper other-crimes evidence. *Quintero*, 2012 IL App (3d) 100857-U, ¶ 17. We affirmed defendant's conviction and sentence. *Id.* ¶ 24.

¶ 16        On August 9, 2013, defendant filed a postconviction petition which was advanced to the second stage of proceedings. On December 12, 2019, an amended postconviction petition was filed alleging, in relevant part, that defendant's due process rights were violated when the jurors were allowed to see him in shackles when they returned to the courtroom to deliver their verdict without the required hearing. Additionally, though it was raised in the motion for a new trial, appellate counsel failed to raise this meritorious issue. Defendant's attached affidavit asserted that he was visibly shackled during the reading of the jury verdict with no other details. Further, defendant alleged that trial counsel was ineffective for failing to investigate claims made by Gonzales regarding his conversation with defendant in Stateville. Defendant argued that, had trial counsel

6

properly investigated the claims, he would have discovered that the layout of the facility made such conversations impossible. In addition to defendant's affidavit, defendant attached an affidavit from another inmate averring that other tiers cannot be viewed from the cells and the noise level is high. Finally, defendant contended that trial counsel was ineffective for not objecting to the admission of Gonzales's November 7, 2001, written statement to police which improperly bolstered Gonzales's testimony and would not have been admitted had he objected. The State filed a motion to dismiss the amended postconviction petition, which was allowed. Defendant appealed.

¶ 17 The Office of the State Appellate Defender was appointed to represent defendant. Upon review of the record, appellate counsel noticed that Gonzales's written statement was not contained within the record on appeal. She detailed her efforts to locate and supplement the record with the written statement. Appellate counsel was unable to obtain the written statement as of September 2024.

¶ 18 II. ANALYSIS

¶ 19 The Post-Conviction Hearing Act (Act) creates a procedure for imprisoned criminal defendants to collaterally attack their convictions based on a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a)(1) (West 2018). "The Act provides a three-stage process for adjudicating postconviction petitions." *People v. English*, 2013 IL 112890, ¶ 23. A postconviction petitioner must "clearly set forth the respects in which petitioner's constitutional rights were violated" and "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2018). Defendant's petition was dismissed at the second stage of postconviction proceedings. "During the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation." *People v. Domagala*, 2013 IL 113688, ¶ 35.

7

At this stage, the State may file an answer or a motion to dismiss. *People v. Mauro*, 362 Ill. App. 3d 440, 441 (2005). "All well-pleaded factual allegations not positively rebutted by the trial record must be taken as true when considering the State's motion to dismiss a second-stage postconviction petition." *People v. Smith*, 2021 IL App (1st) 181728, ¶ 18. A "well-pleaded fact" is one that is alleged in the petition, not positively rebutted by the original trial record, and properly supported by independent evidence. *People v. Delton*, 227 Ill. 2d 247, 256-58 (2008). A claim is said to make a "substantial showing" of a constitutional violation if its allegations, as supported by the independent corroborative evidence, would entitle the petitioner to relief if proven at an evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 35.

¶ 20     On appeal, defendant contends that he made a substantial showing that (1) appellate counsel was ineffective for failing to argue on direct appeal that defendant was prejudiced by the jury viewing him in shackles when the verdict was read, (2) trial counsel was ineffective for failing to investigate the layout of Stateville prison to impeach Gonzales's testimony regarding the conversation that occurred with defendant, and (3) postconviction counsel provided unreasonable assistance where he failed to attach Gonzales's written statement to police to adequately present defendant's claim that these statements improperly bolstered his testimony. We consider each argument in turn.

¶ 21                    A. Ineffective Assistance of Appellate Counsel

¶ 22     "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Thus, a defendant who alleges ineffective assistance "must show that appellate counsel's performance fell below an objective standard of reasonableness and that this substandard performance caused prejudice, *i.e.*, there is a reasonable probability that, but for appellate

8

counsel's errors, the appeal would have been successful." *People v. Golden*, 229 Ill. 2d 277, 283 (2008). The underlying issue must be meritorious for a defendant to suffer prejudice from appellate counsel's failure to raise the issue. *Childress*, 191 Ill. 2d at 175. Because trial counsel offered no contemporaneous objection to defendant remaining shackled, appellate counsel would necessarily have to raise the forfeited issue under the plain error doctrine.

¶ 23    "In Illinois, there are two categories of plain error: prejudicial errors—errors that may have affected the outcome in a closely balanced case—and presumptively prejudicial errors—errors that may not have affected the outcome, but must still be remedied." *People v. Herron*, 215 Ill. 2d 167, 185 (2005). The plain error doctrine permits a reviewing court to remedy a "clear or obvious error" when: (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant argues that the evidence in this case was closely balanced. Before addressing either prong of the plain error analysis, we must first determine whether a clear or obvious error occurred. *Id.*

¶ 24    In *People v. Boose*, 66 Ill. 2d 261, 265 (1977), our supreme court found that "the shackling of the accused should be avoided if possible because: (1) it tends to prejudice the jury against the accused; (2) it restricts his ability to assist his counsel during trial; and (3) it offends the dignity of the judicial process." If a defendant is to remain shackled during trial, the court must state the reasons "for allowing the defendant to remain shackled, and [it] should give the defendant's attorney an opportunity to present reasons why the defendant should not be shackled." *Id.* at 266. "Cases involving shackling of a defendant have been divided into three categories." *People v.*

9

*Walsh*, 80 Ill. App. 3d 754, 768 (1980). The instant case falls within the third category: "where the defendant was seen in shackles for a short period of time either in the courtroom or somewhere in or around the courthouse by the jury." *Id.* "Where, as here, the exposure of a defendant's restraint to the eyes of a juror is brief, reversible error will not be found absent an affirmative showing of prejudice." *People v. Lee*, 325 Ill. App. 3d 643, 652 (2001).

¶ 25    Here, the first mention of defendant remaining shackled occurs well after the completion of the jury trial. Trial counsel explained that he did not notice defendant was still shackled until after he announced ready and the court called for the jurors to be brought into the courtroom. Defendant's affidavit asserts only that he was visibly shackled without further detail or indication that anyone other than trial counsel noticed his shackles. The record contains no indication that the jurors observed defendant wearing shackles or that he was shackled at any time before the jury reached their verdict. As stated in *Lee*,

> "If any of the jurors saw the defendant in restraints, it was at a time when they had already signed and delivered their decision to the court. Their decision as to the defendant's guilt was not subject to change or influence as a result of the incident. Any prejudice to a defendant from his appearance in handcuffs at the reading of the verdict is purely speculative." *Id.*

Thus, we conclude there was no clear or obvious error, as defendant was purportedly seen in shackles only after the jury announced its verdict (even though before completion of polling). See *id.* at 652-53. Accordingly, where the underlying issue was not meritorious, defendant failed to make a substantial showing that appellate counsel was ineffective for failing to raise the issue on direct appeal.

10

¶ 26　　　　In reaching this conclusion, we reject defendant's contention that because the jury had yet to be polled, defendant was prejudiced by the shackling. We agree that, when the jury is polled, a verdict is not final until the jury has had a meaningful opportunity to express to the court that a mistake has been made, which may include a reconsideration of their verdict or a specific disagreement with the verdict that was returned. *People v. Kellogg*, 77 Ill. 2d 524, 528 (1979) However, even if we had found that a clear or obvious error occurred, the fact that the trial has not concluded does not mean that a shackling error is *per se* prejudicial. Numerous cases have declined to reverse shackling errors even when it occurs during the pendency of the trial. See *People v. Reese*, 2017 IL 120011, ¶ 56; *Lee*, 325 Ill. App. 3d at 652-53; *People v. Schaefer*, 217 Ill. App. 3d 666, 671 (1991); *People v. Foster*, 80 Ill. App. 3d 990, 995 (1980); *People v. Greene*, 102 Ill. App. 3d 933, 936 (1981). Moreover, here, the jurors had heard testimony that defendant was being confined in Stateville and were aware of the significant possibility of defendant being held in custody, thereby further undermining any assertion of prejudice.

¶ 27　　　　　　　　　　B. Ineffective Assistance of Trial Counsel

¶ 28　　　　Defendant argues that trial counsel was ineffective for failing to investigate the layout of Stateville to impeach Gonzales's testimony regarding the conversation he had with defendant. "Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *Domagala*, 2013 IL 113688, ¶ 36. To succeed on a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*

11

*v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 29    Whether trial counsel was ineffective for failing to investigate is generally determined by the value of the evidence that was not presented and the closeness of the evidence that was presented. *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). Here, the attached affidavits regarding this issue indicated that the layout and noise level at Stateville was such that inmates on different tiers could not see or communicate with each other in the way described by Gonzales.

¶ 30    Defendant's claim that trial counsel was ineffective for failing to investigate the physical layout of the facility fails because the record demonstrates that counsel pursued a strategy of eliciting information from Gonzales on cross-examination that effectively established the implausibility of his testimony. Counsel successfully obtained concessions from Gonzales that seriously questioned whether the purported exchange was possible. Namely, Gonzales testified that he and defendant were both housed at the facility under a no-contact order and that he never informed any guards or staff about the prohibited communication. Gonzales further acknowledged that the voice he heard identified itself only as Sneaky and that he never actually saw the person speaking. Gonzales confirmed he was housed on the third floor, in M section, which had approximately 20 cells per tier, each housing two inmates. He conceded that as many as 120 inmates could be housed in M section and that the area could get loud due to the number of people talking. Gonzales further acknowledged that he could not see down to the lower tiers from his position. Through this line of questioning, trial counsel demonstrated the implausibility of Gonzales's testimony that he had a conversation with defendant while they were on different tiers.

¶ 31    Moreover, to the extent defendant characterizes not introducing architectural evidence as a failure to further impeach Gonzales's testimony, defendant cannot demonstrate prejudice.

12

Gonzales made numerous admissions to lying about the instant offense. He was thoroughly impeached with inconsistent statements, omissions, lies, and perjured testimony. The jury was well aware of Gonzales's credibility issues and any additional credibility damage from additional evidence regarding the impossibility of his conversation with defendant in jail would have been cumulative.

¶ 32    Accordingly, defendant failed to make a substantial showing that trial counsel was ineffective for failing to investigate the layout of Stateville.

¶ 33                    C. Unreasonable Assistance of Postconviction Counsel

¶ 34    The right to the assistance of counsel during postconviction proceedings is not a constitutional right but rather a statutory provision. *People v. Bell*, 2014 IL App (3d) 120637, ¶ 10. The Act requires that postconviction counsel provide a reasonable level of assistance. *People v. Suarez*, 224 Ill. 2d 37, 42 (2007). Postconviction counsel is appointed to shape a defendant's complaints into the proper legal form and to adequately present those complaints to the court. *People v. Owens*, 139 Ill. 2d 351, 364 (1990); Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 35    Here, defendant argues that postconviction counsel failed to attach Gonzales's written statement to the petition which was necessary for an adequate presentation of his claim. Defendant asserts that it is impossible without the statements, which are not contained within the record on appeal, to evaluate the merit of the ineffective assistance of trial counsel claim that postconviction counsel forwarded.

¶ 36    The written statement in question was admitted into evidence at trial. Claims that can be decided based on the record cannot be properly dismissed because of failure to attach supporting documentation. *People v. Johnson*, 377 Ill. App. 3d 854, 859 (2007). Defendant argues that because the written statement was missing, not contained in the record on appeal, and the record

13

was silent as to the availability of the written statement during second-stage proceedings, it stands to reason that the court did not have access to the written statement at that time. While appellate counsel was diligent in their attempts to locate the statement, it does not follow that because the statement could not be located in 2024 that it was unavailable to the court when it allowed the motion to dismiss in 2021. There is also no indication on the record that the parties did not possess the written statement during the postconviction proceedings. Notably, the arguments contained within the record on this issue addressed its merits and did not allege any insufficiency in necessary supporting documentation, nor does the record indicate that the court dismissed the claim for that reason. Based on the record before us, we cannot say that postconviction counsel provided unreasonable assistance in failing to attach statements contained within the original trial record to the petition.

¶ 37                                    III. CONCLUSION

¶ 38           The judgment of the circuit court of Will County is affirmed.

¶ 39           Affirmed.

14