020 IL App (1st) 161666-U

No. 1-16-1666

Second Division
November 17, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 18499 |
| | ) | |
| PRINCE JOHNSON, | ) | Honorable |
| | ) | Angela Munari Petrone |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's judgment is reversed where it abused its discretion in admitting other-crimes evidence at trial and this error was not harmless. We remand for a new trial without the other-crimes evidence.

¶ 2    Following a jury trial, defendant, Prince Johnson, was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) related to the shooting death of Ryan Cooper. The trial court sentenced him to 60 years' imprisonment, which included a 15-year firearm enhancement (730 ILCS 5/5-1(a)(1)(d)(i) (West 2014)). Defendant appealed, arguing that the trial court erred in (1)

admitting other crimes evidence and (2) imposing an excessive sentence. For the following reasons, we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4      Around 6:30 p.m. on May 19, 2003, Ryan Cooper was shot and killed on the 123rd block of South LaSalle Street in Chicago. In August 2007, the State charged Kenyatta Brown and defendant with first-degree murder in connection with Cooper's death. Brown and defendant were also charged at the same time in the shooting death of Albert Stevenson, which also occurred on May 19, 2003. Defendant and Brown were tried separately.

¶ 5                      A. Motion to Admit Other-Crimes Evidence

¶ 6      Prior to defendant's trial, the State filed a motion to admit other-crimes evidence. Specifically, the State sought to introduce evidence of the Stevenson shooting, which occurred after the Cooper shooting, "as proof of defendants' identities as the murderers of Ryan Cooper and their possession of the weapon used to commit that murder." The State asserted that the probative value of the Stevenson shooting evidence outweighed the potential of unfair prejudice to defendant at trial for Cooper's murder. Defendant filed a motion *in limine* to bar evidence from the Stevenson shooting case.

¶ 7      The trial court granted the State's motion and denied defendant's motion. In its written ruling, the trial court noted the similarities between the two murders, along with the close proximity in time and place. The court found that the probative value of the other-crimes evidence outweighed any prejudicial effect. Finally, the court held that the other-crimes evidence could be admitted to "show identities of both defendants and possession of the weapon used to kill Ryan Cooper."

¶ 8 Defendant requested that the court reconsider its ruling, arguing that the other-crimes evidence was highly prejudicial and that presenting evidence on the Stevenson shooting would create a trial-within-a-trial. Following arguments, the court denied the motion to reconsider. In its ruling, the court stated that the involvement of both defendant and Brown in the Stevenson shooting made the other-crimes evidence relevant and probative. The court also concluded that the other-crimes evidence constituted evidence of a "continuing narrative." The court recognized defendant's concerns of creating a trial-within-a-trial and, to that extent, held that the State was not allowed to introduce evidence "that Stevenson's body was found the next morning or that an autopsy showed Stevenson died of gunshot wounds." Lastly, the court stated that it would give a limiting instruction to the jury regarding the other-crimes evidence.

¶ 9 The State then filed a motion to allow additional witnesses to testify regarding the other-crimes evidence. In particular, the State moved to present DNA evidence establishing that Stevenson's blood was found on Brown's clothing. Defendant filed a response. The court denied the State's motion, finding that such evidence would create a "mini-trial within a trial" and would be "more prejudicial than probative." The case proceeded to jury trial.

¶ 10                                   B. Jury Trial

¶ 11 The State presented the following evidence related to the Cooper shooting.

¶ 12 Sherrie Alston testified that on May 19, 2003, she was living in a house near the intersection of 123rd Street and South Yale Avenue. Around 7 p.m. that evening, she was sitting on her porch when she noticed a red van that she had never seen before parked directly across the street, facing south on Yale. She observed a driver in the van. She then saw Cooper, who she knew from the neighborhood, driving a car northbound on Yale. He stopped the car to speak with a friend on the street and then continued driving north. She testified that as he passed the van, shots were fired at

Cooper from the driver's side window. She and her children ran into her house, and she heard more gunshots. She stated that the van left the area and she saw Cooper's car crashed into a gate. She further testified that she knew Cooper to be part of the "Four Corner Hustlers" gang. On cross-examination, Alston confirmed that she did not know who fired the shots from the van, only that the shots came from the driver's side window.

¶ 13    Chicago police officer Allison Kuciver-Price testified that on May 19, 2003, she and her partner received a dispatch call regarding a car accident at the intersection of 123rd and Yale. At the location, she observed a blue Chevy Lumina crashed into a fence. Upon inspection, she observed an unconscious Cooper in the driver's seat, and it appeared that he had been shot. On cross-examination, she confirmed that she observed an evidence technician recover a .380 caliber firearm from the driver's side floor of the Lumina.

¶ 14    Chicago police detective Kevin Scott testified that he was assigned to investigate Cooper's shooting. When he arrived at the scene, Officer Scott observed Cooper's vehicle crashed into a fence. He stated that Cooper had already been transferred to the hospital. Down the street from the car, he found a shell casing. Officer Scott later learned that Cooper died as a result of gunshot wounds.

¶ 15    Douglas Martell Owens testified that on May 19, 2003, he was in the red van with defendant and Brown, who were in the driver's seat and the front passenger's seat, respectively. All three of them at the time were members of the "Black Disciples" gang. As they parked southbound on Yale, another car pulled up alongside the van and Brown exchanged words with the driver of the car. Owens then saw Brown pull out a semi-automatic handgun, reach over defendant, and shoot three times out of the driver's side window of the van. He stated that he did not see defendant with a gun. After Brown fired the three shots, Owens told defendant to drive away and he exited the

van at the intersection of 118th and Lafayette Street. He spoke with detectives on September 4, 2003, but denied having any knowledge of "some kind of crime." With his lawyer present, Owens again spoke with detectives on August 20, 2007, regarding the Cooper shooting, and then he testified before a grand jury. On cross-examination, Owens stated that he did not know that Brown was going to pull out a gun and shoot someone and that they did not have any conversation prior to Cooper's shooting about Brown's intentions.

¶ 16    Brady Tucker testified that he knew defendant and Brown. He stated that he did not know where he was on May 19, 2003 because he was drinking large quantities of alcohol at the time. He denied seeing defendant and Brown at "Moosie's" studio that day. Tucker continued to respond to most questions with "I don't remember" or "I wasn't with them." He did testify that he, defendant, Brown, and Owens were all members of the Black Disciples at the time of Cooper's shooting but he did not recall there being a gang dispute between the Black Disciples and the Four Corner Hustlers at the time. Tucker also denied talking to a prosecutor or signing a written statement in this case. When presented with the statement, Tucker testified that he recognized his signature on the statement but did not know what he was signing because he was intoxicated. Tucker testified that he recalled meeting with detectives but did not recall testifying before a grand jury.

¶ 17    On April 13, 2004, Detective Scott met with Tucker at the police station and interviewed him in relation to this case. He testified that Tucker did not have any trouble speaking with him and he did not appear to be under the influence of alcohol or drugs. During that interview, Tucker told Detective Scott that he was with Brown, defendant, a man named Bey (Emanuel Owens), and Dwight Thomas at Moosie's recording studio before Cooper's shooting. Tucker told Detective Scott that he, Brown, and defendant left the studio in Brown's van. Brown stopped the van and spoke with a man named Paul, telling him that "they were going to ride around to see if they could

catch someone sleeping." Tucker saw Brown with a black semi-automatic handgun. Tucker asked them to pull the van over and he left in a car with his friend, Quentin Paxton. On cross-examination, Detective Scott testified that Tucker told him that Brown was driving the van during the events involved, and to his knowledge, Tucker was not an eyewitness to Cooper's shooting.

¶ 18     Chicago police detective Daniel Stover testified that in 2007, he and his partner Chicago police detective Timothy Murphy were assigned to the homicide cases of Cooper and Stevenson, which were considered cold cases at the time. On July 22, 2007, Detective Stover and his partner picked up Tucker and took him to the police station. Detective Stover testified that Tucker gave appropriate answers to the questions and did not appear to be under the influence of drugs or alcohol. After interviewing him, Detective Stover called ASA Robertson, who then spoke with Tucker. That interview was memorialized in a handwritten statement, the substantive contents of which are summarized below.

¶ 19     Cook County Assistant State's Attorney (ASA) William Bruce and Rob Robertson, who at the time was a trial supervisor in the State's Attorney's Felony Review Unit, both testified that they spoke with Tucker in July 2007 and confirmed that Tucker gave appropriate answers to questions and did not appear to be under the influence of any drugs or alcohol.

¶ 20     Tucker's 2004 and 2007 statements to detectives were admitted as prior inconsistent statements at trial. Tucker stated that he was at Moosie's recording studio with Brown, Dwight, Bey, and defendant. He left the studio with Brown and defendant and drove into rival Four Corner Hustler territory. He stated that at some point they stopped and Brown spoke with an individual named Paul. Brown told Paul that they were riding around looking for "them" and defendant nodded in agreement. Tucker understood "them" to mean rival gang members, so he asked to be dropped off because he was not "with it." Before he was dropped off with his friend, Paxton,

Tucker saw Brown with a semi-automatic handgun. Tucker later heard several gunshots and then Brown called him. These statements were also consistent with his grand jury testimony, the transcript of which was also entered into the record at trial. Tucker testified that he did not recall making the statements and denied the content of them.

¶ 21    The parties stipulated that if Dr. Ronald J. Knoblock, a deputy medical examiner with the Cook County Medical Examiner's office, was called, he would testify that he conducted an autopsy of Cooper on May 20, 2003. Dr. Knoblock found gunshot wounds on Cooper's neck, left shoulder, and right forearm, along with a grazed gunshot wound on his left forearm. He recovered a bullet in Cooper's spinal cord, a bullet fragment in his right arm, and a metal fragment in the right thigh, which were tendered to a Chicago Police Department forensic investigator. Finally, he determined that Cooper's cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 22    The State presented the following evidence as related to the Stevenson shooting.

¶ 23    Chicago police officer Thurston Daniels testified that on May 19, 2003, he was working with his partner, Officer Donald Carson. Around 10 p.m. that evening, they were located near 119th Street and LaSalle when they heard "a loud noise or bang[.]" Soon after, Officer Daniels observed a shirtless individual running and behind him was a man with a gun. He later learned that these individuals were Stevenson and Brown, respectively. He observed Brown shoot at Stevenson and attempt to shoot a second time but the gun did not fire. The officers pulled their car up to Brown, and Officer Daniels observed Brown put the gun in his waistband. Brown ran away and Officer Daniels chased him on foot. Brown attempted to hand the gun off to defendant but defendant put his hands up and jumped back from Brown. The gun fell to the ground. Officer Daniels recovered the gun and continued to chase Brown on foot. He saw Officer Carson also chasing Brown in the police cruiser. When Officer Daniels saw Brown again, Officer Carson had

him in handcuffs. He handed the gun to Officer Carson, who unjammed it and ejected the magazine, which contained five bullets. The gun, magazine, and bullets were later inventoried at the station. On cross-examination, Officer Daniels confirmed that none of his reports contained information that Brown tried to hand off the gun to defendant.

¶ 24    Kevetta McPhan testified that on May 19, 2003, around 9:30 p.m., she and defendant were sitting on top of a car in Shanoki Powell's driveway, located near the Whites' house on South LaSalle. At some point, she spoke to Stevenson from his car when he drove past. A few minutes later, defendant walked away and made a phone call and she heard him say: "You know the motherf*** out here." She then observed a burgundy car park in front of the Whites' house and three people, including Brown, exit the car. An unidentified man from the car handed Brown a gun and Brown ran into the Whites' house. Soon after, a fight broke out on the porch involving a group of people, including Brown and Stevenson. As Brown and Stevenson fought, McPhan saw Owens help Stevenson up and then Stevenson run away. Brown pulled a gun out of his back pocket and defendant told Brown not to shoot Stevenson because there were too many people around. McPhan also yelled at Brown to not shoot. Brown, however, ran after Stevenson and fired one shot in his direction. At that point, the police arrived and Brown threw the gun and ran away. She only became aware of defendant's presence after the fight when she heard defendant speaking on the phone to someone. She testified that when detectives interviewed her two days later, she did not tell the police that she saw defendant hand Brown the gun or that Stevenson showed her a large wad of money on the day of the shooting.

¶ 25    On cross-examination, McPhan conceded that she told the detectives that defendant handed the gun to Brown, but she stated this was because they were "grilling" her, and when she responded that she did not know who the unidentified male with Brown was, they kept repeating, "You sure

it wasn't Prince?". She testified that the detectives also told her that she could get 12 years' imprisonment for withholding information or that she could be charged as an accessory to the crime. She stated that she was interviewed for "hours" and she was six months pregnant at that time. She eventually implicated defendant in the shooting because she wanted to go home and she did not want to go to jail. She testified that she did not see defendant involved in the fight at the Whites' house until he arrived at the end of it. She further testified that the detective who interviewed her in 2003 made several attempts to date her and showed up at her house on multiple occasions.

¶ 26 Retired Chicago police detective Steven Brownfield testified that on May 22, 2003, he interviewed McPhan at the police station in relation to the Stevenson shooting. He confirmed that on that day, McPhan told him that she saw defendant hand Brown a gun and saw defendant slam Stevenson to the ground and repeatedly ask him where the money was. She told Brownfield that defendant yelled at Brown to shoot Stevenson. Brownfield denied showing up to her house and asking her out on dates.

¶ 27 Detective Stover testified that on July 31, 2007, he and his partner met with McPhan in the courthouse. Detective Stover denied that they threatened McPhan with any criminal charges during the interview. He testified that he offered McPhan coffee and water and showed her where the restroom was located. He confirmed that she told him that she saw defendant hand Brown a handgun after they exited the burgundy car outside of the Whites' house; that she saw defendant slam Stevenson to the ground and repeatedly ask him about money; that she heard defendant tell Brown to "shoot him"; and that she saw defendant make two phone calls after Brown shot at Stevenson and ran away. She also told him that she had seen Stevenson earlier that day and he had

shown her a big wad of money. Finally, he testified that she never told him that it was an individual other than defendant who handed Brown the handgun.

¶ 28    On cross-examination, Detective Stover testified that he may have gone to McPhan's house to serve her a subpoena but he did not ever attempt to date her. He had no idea whether McPhan was pregnant at the time of her grand jury testimony, and he denied telling McPhan during her interview that defendant handed the gun to Brown, not the unidentified man.

¶ 29    ASA Bruce testified that he spoke with McPhan on July 31, 2007. He testified that she arrived that day pursuant to a subpoena. He confirmed that she did not say anything to him that caused him any concern over her treatment that day. He stated that he did not have any knowledge as to whether she was pregnant that day and she did not give him any indication that she was in distress.

¶ 30    Owens, who testified on behalf of the State regarding the Cooper shooting, also testified regarding the Stevenson shooting. According to his testimony, on the same day of the Cooper shooting he saw Brown and Stevenson fighting and tried to stop the fight. At one point, he helped Stevenson up and Stevenson ran away from Brown. Owens then saw Brown wrap a jersey around a handgun and fire it at Stevenson. According to Owens, defendant was not near Brown at this point. When the police arrived, Brown threw the gun at Owens and fled. Owens stated that he stepped away from the gun and the police picked it up. He saw the police chase Brown through a vacant lot and into an alley. He did not speak to any police officers that day. On cross-examination, Owens testified that he did not see defendant hand Brown the gun and he did not hear defendant tell Brown to shoot Stevenson

¶ 31    During the presentation of evidence related to the Stevenson shooting, the trial court twice admonished the jury as to the limited purpose of the evidence. The court's second limiting instruction, which was substantially similar to the first, was as follows:

"Ladies and gentlemen of the jury, evidence has been received from numerous witnesses that the defendant, Prince Johnson, has been involved in an offense other than that charged in the indictment. That is a matter involving Albert Earl Stevenson. This evidence has been received on the issue of the defendant, Prince Johnson's, identity and possession of the weapon and may be considered by you only for those limited purposes.

It is for you to determine whether the defendant, Prince Johnson, was involved in that matter involving Albert Earl Stevenson and, if so, what weight should be given to this evidence on the issue of identity and possession of a weapon."

¶ 32    Illinois State Police forensic scientist Marc Pomerance testified as an expert in firearms identification. Pomerance concluded that the casing found at the Cooper shooting and the bullet found at the Stevenson shooting were both fired from the same firearm, which was the one recovered from the Stevenson shooting. He further testified that neither the casing nor the bullet was fired from the gun found on the floorboard of Cooper's car.

¶ 33    After the State rested, defendant moved for a directed verdict arguing that the State failed to prove beyond a reasonable doubt that defendant committed first-degree murder by virtue of accountability for Brown's actions. The court denied the motion.

¶ 34    The defense presented the following evidence.

¶ 35    Shanoki Powell testified that in May 2003 she was living near the intersection of 119th Street and South LaSalle, which was three or four houses away from the Whites. She testified that on May 19, 2003, she was outside with her sister and McPhan when she heard a commotion down

the block, which she later discovered was a fight as it began to move closer to her house. She recognized Stevenson and Brown. She stated that she saw defendant that night too but he was not involved in the fight. She observed Brown slam Stevenson to the ground. As they continued fighting, she saw Stevenson lose his t-shirt and run away. She then saw Brown pull out a gun and shoot one time at Stevenson. She testified that Brown ran away but the police grabbed him and put him in the police car. She stated that she never heard defendant yell anything to Brown and he did not join in the fight at any point. She also never saw defendant hand Brown a gun.

¶ 36     On cross-examination, Powell testified that she did not know how the fight began and that she saw defendant near her backyard during the fight. She stated that the fight never went into the Whites' house or on the porch. Powell stated that she did not see Brown drop the gun and she did not see the police recover the gun. She stated that she did not see defendant again after Stevenson was shot. She did not talk to the police that night. The first time she spoke of her knowledge of the shooting was when defendant's investigator, Rosa Silva, came to speak with her in 2007. She also stated that she was still friends with defendant.

¶ 37     Tracey White testified that on May 19, 2003, she was 16 or 17 years old and living on South LaSalle. On that day, she was sitting on her couch when Stevenson came into the house to speak with one of her cousins. Stevenson then left the house but quickly ran back inside followed by a group of men. White saw the men grab Stevenson and she told them to get out of her house. She then watched from a window as the men began hitting Stevenson in front of her house. She testified that defendant was not one of the individuals involved in the fight but that she saw him watching the fight. She never heard defendant yell anything. White stated that at some point she could no longer see the fight but she heard a gunshot. She spoke to detectives about the incident the next day but never testified before a grand jury.

¶ 38    On cross-examination, White stated that at that time she considered defendant to be a friend. She testified that while the men were beating up Stevenson, defendant was standing on the porch. She confirmed that she told the police officers the same information as in her current testimony. She stated that she was subpoenaed and came to the courthouse. She stated that at the time of her first interview, the detectives were not interested in defendant's role in Stevenson's shooting and she would only have mentioned his name if they asked specifically about him.

¶ 39    The defense rested. The State offered in rebuttal stipulated testimony that if recalled, Detective Brownfield would testify that on May 20, 2003 he interviewed White and she did not mention defendant's name. The State also offered the stipulation that if recalled, Detective Stover would testify that he and his partner interviewed White on July 30, 2007 and she did not mention defendant's name. The State rested in rebuttal.

¶ 40    Following closing arguments, the court instructed the jurors as follows:

"Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

***

Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment. This evidence has been received on the issue of the defendant's identification and possession of a weapon, and it may be considered by you only for those limited purposes.

It is for you to determine whether the defendant was involved in that offense and, if so, with [*sic*] weight should be given to this evidence. And the issues of defendant's identification and possession of the weapon."

¶ 41    The jury was also instructed as to the following definition of "legally responsible":

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." I.P.I Criminal No. 5.03.

For the charges levied against defendant, the court instructed the jury as to the elements of the offenses and that the jury must find that either defendant or "one for whose conduct he is legally responsible" committed the requisite acts.

¶ 42 The jury found defendant guilty of first-degree murder and that he was armed with a firearm. Defendant filed a motion for a new trial, raising several issues including error in allowing the State to introduce other-crimes evidence. The motion was denied.

¶ 43                                    C. Sentencing

¶ 44 At sentencing, the State argued for a 55-year sentence, plus the additional mandatory 15 years for the firearm enhancement. The State contended that the case involved "an obviously violent act that was carried out with premeditation and purpose." The State acknowledged that defendant did not personally cause the death of Cooper but that the jury found him accountable, or legally responsible, based on "his relationship with and the actions that he took along with the gunman in this case, Kenyatta Brown." The State also referenced defendant's criminal history contained in the presentence investigation report, which included a 1999 battery, a 2000 aggravated assault of a police officer, and two misdemeanors in 2001 for criminal trespass of a vehicle.

¶ 45 Defense counsel argued for the minimum sentence. In mitigation, defendant's mother, Tamika Johnson, testified that defendant was a positive influence on his siblings and that he made a conscious decision to change his lifestyle when his girlfriend became pregnant.

¶ 46 Defense counsel began his sentencing argument by stating: "Judge, what I would like to point out to [Y]our [H]onor is that the decisions that we make at 17 and 18 are usually not the same decisions and choices we would make at 25 or at 33, as [defendant] sits here today." Counsel emphasized that defendant was convicted based on a theory of accountability; defendant did not shoot Cooper himself; defendant's criminal history was not in fact so extensive with only one felony on his record; defendant was employed and was supporting his children prior to his arrest; and since being in custody he has obtained his GED and has worked as a barber.

¶ 47 The trial court ultimately sentenced defendant to 45 years for first-degree murder and 15 years for the firearm enhancement, for a total of 60 years' imprisonment. In so ruling, the court noted that defendant was 20 years old at the time of the murder, not a teenager as argued by defense counsel. The court stated that the murder was motivated by a gang rivalry and was "calculated, premeditated, and cold-blooded" and that defendant's sentence was "necessary to deter others, particularly other members of gangs who might be tempted to go onto the street and shoot other individuals because of some rivalry." In mitigation, the court acknowledged defendant's minimal criminal history, that defendant was not actually the shooter, and that defendant's upbringing was loving and supportive.

¶ 48 Defendant filed a motion to reduce the sentence, arguing that it was excessive in light of his young age and lack of violent criminal background. This motion was denied and this appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50                                    A. Other-Crimes Evidence

¶ 51    Defendant first argues that the trial court erred in allowing the State to introduce evidence related to the Stevenson shooting, which occurred about three hours after the shooting of Cooper. Specifically, defendant asserts that the other-crimes evidence introduced was highly prejudicial and irrelevant and did not serve as identity evidence. Accordingly, defendant requests that we reverse his conviction and remand for a new trial without the other-crimes evidence. For the reasons that follow, we find that the other-crimes evidence was improperly admitted at trial and remand for a new trial.

¶ 52    We review the admission of other-crimes evidence for an abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). Abuse of discretion is found where the trial court's decision is "arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view." *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 38.

¶ 53    Pursuant to Rule 404(b) of the Illinois Rules of Evidence (eff. Jan. 1, 2011), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith[.]" It may, however, be admissible for purposes other than propensity, such as to show *modus operandi*, intent, motive, identity, or absence of mistake. *People v. Pikes*, 2013 IL 115171, ¶ 11. Even so, courts generally prohibit the admission of other-crimes evidence to protect against the jury convicting a defendant because he or she is a bad person deserving punishment. *People v. Manning*, 182 Ill. 2d 193, 213-214 (1998). A defendant is entitled to have his guilt or innocence evaluated solely on the basis of the charged offense. *People v. Lampkin*, 98 Ill. 2d 418, 430 (1983). Thus, the trial court must weigh the probative value of the evidence against its prejudicial effect and exclude the evidence if its prejudicial effect substantially outweighs its probative value. *People v. Placek*, 184 Ill. 2d 370, 385 (1998).

¶ 54    To be admissible, other crimes evidence must also have "some threshold similarity to the charged offense." *People v. Donoho*, 204 Ill. 2d 159, 184 (2003). As factual similarities increase, so does the relevance or probative value of the other crimes evidence. *People v. Bartall,* 98 Ill. 2d 294, 310 (1983) ("It is this similarity which increases the relevance of the evidence and ensures that it is not being used solely to establish the defendant's criminal propensities."). However, unless the evidence is offered to prove *modus operandi*, "mere general areas of similarity will be sufficient to allow the evidence to be admitted[.]" *People v. Wilson*, 214 Ill. 2d 127, 141 (2005).

¶ 55    The crux of defendant's argument on appeal is that "an offense that occurred *after* the charged offense has no relevance to a defendant's identity as the perpetrator of the charged offense" under this court's decision in *People v. Rosado*, 2017 IL App (1st) 143741. In *Rosado*, the defendant was arrested and charged for a series of drug deliveries that occurred on March 18, March 23, and March 29 of 2011. *Id.* ¶ 3. The State elected to first try the case related to the March 29 transaction and sought to introduce the March 18 and March 23 transactions as other-crimes evidence. *Id.* ¶ 4.The trial court denied the motion, finding that the other-crimes evidence was more prejudicial than probative. *Id.* After trial, the defendant was acquitted. *Id.*

¶ 56    The State then proceeded to try the case involving the March 23 delivery by introducing the March 29 transaction as other-crimes evidence to prove identity. *Id.* ¶ 5. The court admitted the evidence and denied the defendant's request that the jury be informed that he was acquitted as to March 29 transaction charge. *Id.* The court admonished the jury as to the other-crimes evidence with a limiting instruction. *Id.* ¶ 16. The jury found the defendant guilty of the March 23 drug offense. *Id.* ¶ 17.

¶ 57    On appeal, this court concluded that the trial court abused its discretion in admitting the other-crimes evidence because it could not bolster identification, had no other relevance, and was

more prejudicial than probative. *Id.* ¶ 26. Specifically, the court pointed to the officers' testimony in stating: "[T]he officers did not explain how their ability to recognize [the defendant] on March 23, both in person and in the photo array that same day, was somehow increased based on what they saw six days later on March 29." *Id.* ¶ 25.

¶ 58     We do not read *Rosado* as standing for the general proposition that evidence of other crimes which occur after the charged offense are *per se* inadmissible. Thus, to the extent that defendant argues for such a rule, we disagree. We note in particular our supreme court's decision in *Bartall*, which the parties appear to have overlooked. Issued decades prior to *Rosado*, the court in *Bartall*, explicitly rejected a categorical rule that other-crimes evidence may not consist of subsequent acts. 98 Ill. 2d at 312-313. Instead, the *Bartall* court held that other-crimes evidence of a shooting that occurred 20 hours after the charged shooting was admissible and "proper to show the defendant's intent in the prior shooting." *Id.* at 309. In reaching this conclusion, the court cited to multiple cases from Illinois and other states where courts admitted "evidence of conduct subsequent to the criminal act charged for other purposes." *Id.* at 313-14 ("There is no valid reason for limiting the availability of subsequent-crimes evidence in cases where it is used to show 'intent' but not in cases where it is used to show '*modus operandi*.' "). The court ultimately concluded that the primary test for admitting other-crimes evidence is its relevance to the crime charged. *Id.* at 313.

¶ 59     Subsequent to  the submission of briefs in this case, this court decided *People v. Johnson*, 2020 IL App (1st) 162332. In *Johnson*, the defendant was charged with various crimes related to a kidnapping and sexual assault. Over the defendant's objection, the trial court allowed the State to present other-crimes evidence regarding the defendant's involvement in a similar sexual assault two weeks after the one for which defendant was being tried. *Id.* ¶¶ 6-7. On appeal, the defendant argued, *inter alia*, that such evidence was inadmissible under *Rosado* because it occurred later than

the crime at bar. *Id.* ¶ 38. We rejected that argument, stating "there is no requirement that the other incident being offered in the other-crimes evidence occur prior to the charged offense." *Id.* ¶ 48 (citing *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 79); see also *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005).

¶ 60    Clear from *Bartall,* the primary considerations in admitting other-crimes evidence are whether the evidence is relevant for a purpose other than propensity and is more probative than prejudicial. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). With these principles in mind, we turn our attention to the facts in this particular case, and the purported bases on which the other-crimes evidence was offered: defendant's identity and possession of the weapon.

¶ 61    The use of other-crimes evidence to show identity serves to, of course, identify the defendant as the perpetrator of the charged offense. *People v. Quintero*, 394 Ill. App. 3d 716, 726 (2009). "Identity is at issue whenever the defendant denies he was the offender." *People v. Boyd*, 366 Ill. App. 3d 84, 92 (2006). Defendant argues that the evidence of the Stevenson shooting was irrelevant because his identity as being present at the Cooper shooting was not at issue, thus the other-crimes evidence "served only to paint [him] as a violence-prone menace." In fact, it was undisputed at trial that defendant was in the van when Brown shot Cooper. Owens testified to that fact. Defendant never claimed otherwise or put forward any evidence to suggest that he was not in the van. Nonetheless, the State presented evidence of the Stevenson shooting and the court informed the jury on multiple occasions that the purpose of that evidence was to prove defendant's identity. That evidence, however, was irrelevant where defendant's identity was not at issue and, in light of Owens' unrefuted testimony, was not necessary to prove that defendant was in the van during the Cooper shooting. See *People v. Boand*, 362 Ill. App. 3d 106, 124 (2005) (finding that the court should not have instructed the jury to consider other-crimes evidence for the purpose of

identity where identity was not at issue at trial). Further, based on our review of the evidence at trial, we fail to see how evidence of the Stevenson shooting would prove defendant's identity at the Cooper shooting even if defendant's identity had been disputed.

¶ 62    The State contends in its brief that "the reason defendant's identity was not contested was because he was seen with the murder weapon shortly after it happened." Having reviewed all of the testimony presented by the State, as well as by defendant, regarding both the Cooper and the Stevenson shootings, we disagree with the State's contention. Defendant's identity as at the scene and driving the van when Cooper was shot was based on Owens' uncontroverted testimony that defendant was present. Moreover, even if we could agree with the State's posture, that would not alter the fact that defendant's identity in the Cooper shooting was not a fact in dispute. Accordingly, not only do we not find any probative value in the other-crimes evidence as it relates to defendant's identity, as his identity was not in dispute, we find that it has no relevance.

¶ 63    We believe that the other basis on which the other crimes evidence was admitted, proof of defendant's possession of the weapon, was also admitted in error. Moreover, even if we could find that this evidence was properly admitted, it would not serve to prove defendant's possession of the weapon in the Cooper shooting.

¶ 64    The State presented several witnesses on the Stevenson shooting.  It was Owens' testimony that defendant did not have the gun at either Cooper's or Stevenson's shooting. In fact, Owens testified that after the Stevenson shooting, Brown tossed the weapon at him, not at defendant. McPhan testified that defendant did not have the weapon at the Stevenson shooting and that she only inculpated him in that regard out of threats made to her by police officers. Officer Thurston testified that Brown attempted to hand the gun off to defendant but defendant did not receive it. On cross examination, Officer Thurston confirmed that this fact was not among those included in

his incident reports. Other than McPhan, only retired detective Brownfield and Detective Stover testified that Brown gave the gun to defendant. Their testimony was based on a statement allegedly made to them by McPhan during questioning, a statement which she disavowed during her testimony at trial. Witnesses on behalf of defendant, who admitted a friendship with defendant, testified that defendant was not involved in the fight with Stevenson and they never saw Brown hand the weapon to defendant or vice versa. Their testimony was corroborated by Owens, the State's witness. Clearly, any evidence to support a conclusion that defendant possessed the gun at the Stevenson shooting was conflicted, to say the least, and absolutely refuted by the State's own witness, Owens.

¶ 65    We also point out that the other-crimes evidence lacks sufficient similarity to the Cooper shooting. "When other-crimes evidence is offered for such a relevant purpose, it is admissible only when the other crime has a threshold similarity to the charged crime." *Quintero*, 394 Ill. App. 3d at 725 (citing *People v. Cruz*, 162 Ill. 2d 314, 348-49 (1994). "This threshold requirement serves to increase the relevancy of the evidence and ensures that the evidence is not being used solely to establish a defendant's criminal propensities." *Cruz*, 162 Ill. 2d at 349. Other than Brown and defendant both being identified as being at the location of the shooting, the two crimes here bear little resemblance to one another in any significant way. Most significantly, the crimes appear to have different motives. The State conceded at oral argument, and the testimony of both Tucker and Owens bear out, that the Cooper shooting was gang-related. The Stevenson shooting, on the other hand, appeared to be motivated by money, where there was some testimony that Stevenson showed McPhan a large wad of money just prior to the incident. Additionally, in the Cooper shooting, Brown and defendant were together in a van parked on a street and Brown shot at Cooper who was also in a car. In the Stevenson shooting, a fight broke out at a neighbor's house and once

it moved outside, Brown shot at Stevenson as he tried to run away. There is conflicting testimony as to whether defendant arrived with Brown in the car at the Stevenson shooting or was already in the area. At trial, McPhan testified that prior to the shooting, she and defendant were sitting on top of a car in Powell's driveway. Detective Stover testified that McPhan told him that she saw defendant hand Brown a handgun after exiting the car outside of the White's house. Owens testified, however, that he did not see Brown hand defendant a gun. The only similarity, about which there is no dispute, is the use of the same firearm, of which there is no evidence that defendant had control or possession during the Cooper shooting and the evidence of his connection to it in the Stevenson shooting is largely conflicting. We find that this lack of similarity strengthens our determination that evidence of the Stevenson shooting had no probative value on the issue of defendant's possession of the gun in the Cooper shooting.

¶ 66    Additionally, the prejudicial impact of this evidence cannot be ignored. "Evidence has been defined as being unduly or unfairly prejudicial when it has 'an undue tendency to suggest a decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror.' " *People v. Hale*, 2012 IL App (1st) 103537, ¶ 35 (quoting *People v. Edgeston*, 157 Ill. 2d 201, 237 (1993)). Here, in the face of evidence of defendant's gang affiliation and deadly shooting of Cooper, the jury heard evidence that placed defendant at the scene of a second deadly shooting, within hours of the first. They also heard evidence, albeit conflicting, that defendant was engaged in a fight with Stevenson and that he not only urged Brown to shoot him, but that he handed the gun to Brown to complete the act. Regardless of defendant's guilt or lack thereof as to the Stevenson shooting, the evidence insinuated defendant's association with another murder on the same day. It is hard to imagine that this did not engender a prejudicial impact on the jury, particularly in light of the extensiveness of the evidence presented on the Stevenson shooting. See

*People v. Lindgren* 79 Ill. 2d 129, 137 (1980) ("Such evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment.").

¶ 67     The extensiveness of the Stevenson shooting evidence further increased the likelihood of prejudicial impact. Other-crimes evidence "must not become a focal point of the trial." *People v. Bedoya*, 325 Ill. App. 3d 926, 938 (2001). Here, in addition to Owens, the State presented McPhan as its other eyewitness to the Stevenson shooting. The State then presented testimony from several law enforcement officers and a prosecutor to partially impeach, not only McPhan's testimony concerning the handoff of the gun, but also that of their other witness, Owens. Defendant then presented two witnesses to rebut the State's witnesses. Although some of the witnesses were common to both shootings, the volume of testimony received regarding the Stevenson shooting was fairly extensive, especially where it necessitated defendant calling witnesses to rebut the evidence presented as to the Stevenson shooting. See *id.* at 940-41 (stating that the detail and repetition of the other-crimes evidence "served no purpose other than to inflame the jury").

¶ 68     The jury was also required to resolve additional conflicts and make more credibility determinations as a result of the Stevenson shooting evidence. As such, what occurred in this case was precisely that which the trial judge, during her careful deliberations on the State's motion, clearly sought to avoid at the outset, an impermissible "trial within a trial." *Bartall*, 98 Ill. 2d at 315; see also *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995) (holding that when admitting other-crimes evidence, the trial court should be careful to avoid a "mini-trial" of the other offense). Even if the other-crimes evidence were relevant to defendant's possession of the weapon, the evidence presented was not remotely limited to the evidence that a witness observed defendant holding the weapon some hours after the Cooper shooting. See *People v. Diaz*, 78 Ill. App. 3d 277, 280 (1979) (finding the other-crimes evidence prejudicial where it was not limited to the

defendant's possession of the stolen weapon and the circumstances of his arrest but instead was comprised of the complete details of the other crime).

¶ 69    Finally, we believe that the prejudicial impact of the other-crimes evidence admitted here could not be remedied by the issuance of limiting instructions. *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006) ("When the unfair prejudice is excessive, a limiting instruction will not save admissibility of the evidence."). Moreover, the trial court's limiting instructions, which generally serve the important purpose of reducing any prejudicial effect, were not curative because they directed the jury to an irrelevant purpose. As such, we must conclude that the trial court abused its discretion in admitting the other-crimes evidence to prove defendant's identity as there was no probative value on that ground and the evidence was highly prejudicial.

¶ 70    As a final note, we acknowledge the potentiality of other permissible purposes for the other-crimes evidence. Though there is clear and extensive caselaw regarding the effects of an overbroad limiting instruction for other-crimes evidence (see *People v. Carter*, 38 Ill. 2d 496, 504 (1967) ("Evidence admissible for one purpose is not affected by inadmissibility for another.")), there is little regarding the opposite situation: where none of the purposes set forth in the limiting instructions were proper, but other purposes could have been valid reasons for admitting the evidence. Our research has revealed a single published case on this point, *People v. Lenley*, where the court determined that none of the four purposes included in the limiting instruction were applicable and at issue at trial but that *modus operandi* could have been a permissible purpose had it been argued on appeal and submitted to the jury. 345 Ill. App. 3d 399 (2003). We find the *Lenley* court's observations on the effects of an other-crimes limiting instruction instructive. There, the court stated as follows:

"[S]ince we presume that jurors take direction from limiting instructions and consider evidence only in a manner in which they are told to consider it, the instruction on the use of other-crimes evidence, if given, needs to be accurate. When jurors are told to consider this kind of evidence for intent, motive, design, and lack of mistake and the evidence has no bearing on those matters, jurors have no way to use the evidence in an appropriate limited manner. When evidence that harbors such a potential for misuse has been admitted and jurors have been told to consider it for the wrong reasons, we cannot presume that jurors used the evidence for a limited valid reason about which they were not informed." *Lenley*, 345 Ill. App. 3d at 411-12.

The State does not make any other permissible use argument here on appeal, and we express no opinion on the matter. Here, improper purposes were put to the jury and, for the same reasons as explained in *Lenley*, we decline to infer or seek out a permissible purpose that was not put to the jury.

Following hearing on the State's motion, the trial court determined that the other-crimes evidence as proposed by the State was more probative than prejudicial and specifically found that its prejudicial effect was minimized due to the court's limitation of the evidence to be presented and the limiting instructions to the jury. However, after reviewing the evidence as presented at trial, we must disagree. The evidence actually presented was neither relevant nor probative particularly as to the undisputed identification of defendant in the Cooper shooting. See *People v. Lenley*, 345 Ill. App. 3d 399, 412 (2003) (where the purposes were inapplicable to the issues at trial, "the balancing process by which the evidence was allowed to be heard is inherently flawed"). As such, we find the court's admission of this evidence to have been an abuse of discretion.

¶ 71                                    B. Harmless Error

¶ 72    We must now determine whether the court's error in admitting the other-crimes evidence was harmless. "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *Lindgren*, 79 Ill. 2d at 140. However, admission of other crimes evidence is harmless beyond a reasonable doubt "when a defendant is neither prejudiced nor denied a fair trial based upon its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). It is the State's burden to prove beyond a reasonable doubt that the result would have been the same without the improperly admitted evidence. *Quintero*, 394 Ill. App. 3d at 728.

¶ 73    The evidence of defendant's guilt in the Cooper shooting, namely his accountability or legal responsibility for the actions of Brown, was not overwhelming. The only evidence of defendant's accountability was that he was the driver of the van when the shooting took place and Tucker's implicating statements. Specifically, Tucker stated in interviews to law enforcement that while in the van, Brown stated that they were going to look for rival gang members and defendant nodded in agreement and Brown revealed the firearm in the van prior to the Cooper shooting. Tucker's statements, however, suffer from credibility issues where his statements were largely disavowed at trial and he claimed to have an alcohol dependence problem. Thus, without the Stevenson shooting evidence, there is some evidence of defendant's accountability but it is not so strong as to conclude that the verdict would be the same without the other-crimes evidence. See *People v. Hogan*, 388 Ill. App. 3d 885, 894 (finding that evidence was sufficient to support conviction but was not so overwhelming for the harmless error analysis).

¶ 74    Additionally, as we have stated, the other-crimes evidence was highly prejudicial, especially as the degree of defendant's involvement in the Stevenson shooting was, at best, uncertain and was the subject of conflicting testimony by multiple witnesses. The other-crimes evidence presented at trial was also extensive; several witnesses testified as to what occurred

during the Stevenson shooting and the defendant was forced to present witnesses to rebut the State's evidence.

¶ 75    As a reviewing court, we recognize that we owe some deference to the trial court's ability to evaluate the impact of evidence on the jury. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Reflecting on the State's comment at oral argument that testimony at trial may sometimes differ from that which is anticipated, as a reviewing court we are also cognizant that, unlike the trial court, we have the benefit of hindsight. However, based on the record, now fully developed and before us, we simply cannot find it "unlikely that the error influenced the jury." *Boyd*, 366 Ill. App. 3d at 95. Because the State has failed to carry its burden of persuasion to prove beyond a reasonable doubt that the result would have been the same without the other-crimes evidence, the admission of the other-crimes evidence was not harmless. Thus, we remand for a new trial without the other-crimes evidence.

¶ 76                              C. Double Jeopardy

¶ 77    Finally, because we are remanding for a new trial, we must determine whether another trial on the matter would violate the double jeopardy clause. *People v. Ward*, 2011 IL 108690, ¶ 50. "The double jeopardy clause forbids a second, or successive, trial for the purpose of affording the prosecution another opportunity to supply evidence it failed to muster in the first proceeding." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). "Double jeopardy does not preclude retrial of a defendant whose conviction is supported by sufficient evidence but set aside because of errors in the trial process." *People v. Jiles*, 364 Ill. App. 3d 320, 331 (2006) (citing *Olivera*, 164 Ill. 2d at 393). "Retrial is the proper remedy if the evidence presented at the initial trial, including any improperly admitted evidence, was sufficient to sustain the conviction." *People v. Drake*, 2019 IL 123734, ¶ 21.

¶ 78     In considering the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). Based on the evidence presented at trial, there was sufficient evidence from which a rational trier of fact could have found each of the essential elements of the offense of first degree murder via legal responsibility beyond a reasonable doubt. As such, no double jeopardy violation is implicated upon retrial. This conclusion does not, however, imply that we have made a finding as to defendant's guilt on retrial. See *People v. Placek*, 184 Ill. 2d 370, 391 (1998). Because we have found defendant's first argument meritorious and we remand for a new trial, it is unnecessary to  address defendant's arguments regarding his sentence.

¶ 79                                III. CONCLUSION

¶ 80     For the reasons stated, we reverse the judgment of the circuit court of Cook County and remand for a new trial not inconsistent with this order.

¶ 81     Reversed and remanded.